UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWARD BOGANSKI | : | NO.: 3:01CV2183 (AVC) |
| | : | |
| v. | : | |
| | : | |
| CITY OF MERIDEN BOARD OF | : | |
| EDUCATION AND JOHN CORDANI | : | APRIL 29, 2005 |

**LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, the defendants, City of Meriden Board of Education and John Cordani, submit the following statement of undisputed material facts in support of their Motion for Summary Judgment dated April 29, 2005. Affidavits and other admissible evidence are attached as exhibits.

1. Edward Boganski began working for the Meriden Public Schools on August 30, 1993, as a night custodian at Pulaski School. See Complaint, ¶6; **Exhibit A**, p. 11; **Exhibit B**, No. 5.

2. Boganski subsequently applied for, and was given, the position of van driver/custodian. In this position, Boganski delivered mail to the schools and performed custodial work at the Board of Education building. See Complaint, ¶6; **Exhibit A**, p. 14.

3. In October 1997, Boganski was promoted to the head custodian position at

Washington Middle School.  See Complaint, ¶6; **Exhibit A**, p. 15.

4. Boganski interviewed for the head custodian position with the school principal Shellie Pierce, and John Cordani, Manager of Buildings and Grounds.  See **Exhibit A**, p. 16.

5. Pierce was Boganski's immediate supervisor at Washington Middle School through June 1999.  See **Exhibit A**, p. 17.

6. On July 1, 1999, Jeffrey Villar became the Assistant Principal at Washington Middle School, and Boganski's immediate supervisor.  See **Exhibit A**, pp. 17, 70; **Exhibit C**, ¶4.

7. Boganski, like all head custodians, also reported to Cordani as needed.  See **Exhibit A**, pp. 17-18.

8. The school year commenced in late August or early September.  See **Exhibit A**, p. 70.

9. In October 1999, Washington Middle School needed fuel oil.  Boganski called the vendor that the Meriden Public Schools used for fuel oil, and was told that he needed a purchase order.  See Complaint, ¶8; **Exhibit A**, pp. 41-42.

10. At the time, the Meriden Public Schools was using a new vendor for fuel oil. Purchase orders had not been required in the past.  See **Exhibit D**, ¶7; **Exhibit E**, ¶6.

11. Boganski called Cordani regarding the need for fuel oil and the vendor's request

for a purchase order to obtain that fuel oil.  See Complaint, ¶9; **Exhibit A**, pp. 41-50.

12. Cordani told Boganski to give the vendor a purchase order number.  See **Exhibit A**, p. 51; **Exhibit D**, ¶¶5,6.

13. Subsequently, on October 12, 1999, Boganski complained to Villar that Cordani had told him to make up a purchase order.  See Complaint, ¶11, **Exhibit A**, pp. 51-52; **Exhibit B**, No. 23; **Exhibit C**, ¶6.

14. Villar did not perceive Cordani's request regarding the issuance of a purchase order as improper or shady.  See **Exhibit C**, ¶¶6, 7.

15. Boganski and Cordani spoke again.  Boganski told Cordani that he did not feel comfortable making up a purchase order number.  Cordani hung the phone up without saying goodbye.  See Complaint, ¶¶6, 10; **Exhibit A**, pp. 53-54; **Exhibit D**, ¶¶8, 9.

16. Boganski then called Glen Lamontagne, the Assistant Superintendent.  Boganski was upset, and complained to Lamontagne about his conversation with Cordani.  See **Exhibit A**, p. 54; **Exhibit F**, ¶5.

17. Lamontagne subsequently spoke with Cordani and advised him to make sure that if fuel oil was needed that it be delivered.  See **Exhibit F**, ¶7.

18. Lamontagne did not perceive Cordani's request as improper.  See **Exhibit F**, ¶6.

19. The phrase "make up a purchase order" is used interchangeably with "issue a purchase order." See **Exhibit C**, ¶7; and **Exhibit F**, ¶6.

21. Ultimately, Cordani's assistant, Catherine Figura, called the vendor and gave the company a purchase order number. See **Exhibit D**, ¶10; **Exhibit E**, ¶9.

22. Figura did not perceive Cordani's request as improper. See **Exhibit E**, ¶10.

23. Villar never spoke with Cordani regarding the purchase order incident prior to this litigation. See **Exhibit C**, ¶9; **Exhibit D**, ¶13.

24. Boganski had gone to both Villar and Lamontagne in an effort to obtain the fuel oil. See **Exhibit A**, pp. 53-55.

25. Boganski had refused to make up a purchase order and he needed assistance in getting the oil. See **Exhibit A**, pp. 55-56.

26. Boganski was not seeking to get Cordani reprimanded or fired. See **Exhibit A**, pp. 53-54.

27. Boganski never considered going to the police to report what he allegedly believed to be an illegal request, nor did he ever consider going to the press. See **Exhibit A**, p. 305.

28. Boganski never formed an opinion as to whether or not Cordani was attempting to obtain fuel oil without the Board of Education paying for it. See **Exhibit A**, p. 202.

29. Boganski began receiving memos from Jeffrey Villar that were critical of his

4

work performance as early as September 7, 1999, a month prior to Boganski's complaint.  See **Exhibit A**, pp. 64-68, 77-80; **Exhibit C**, ¶11; **Exhibit G**.

30. Some of Villar's memos were critical; others simply provided directives to Boganski as the head custodian.  See **Exhibit C**, ¶11; **Exhibit G**.

31. Cordani did not direct, or otherwise pressure, Villar to write any memos to Boganski.  See **Exhibit C**, ¶17; **Exhibit D**, ¶15.

32. On December 23, 1999, Boganski was suspended for three days (December 28, 29 & 30, 1999) without pay.  See Complaint ¶15, **Exhibit A**, p. 104.

33. Shellie Pierce, in consultation with Jeffrey Villar and Glen Lamontagne, issued the suspension.  See **Exhibit B**, No. 25; **Exhibit H**.

34. The suspension was given for two reasons: (1) Boganski's failure to obtain training for the custodians under him on the controlled air computer system, despite directives to do so, and (2) his lying about the possession of a Sonitrol list.  See **Exhibit A**, p. 105; **Exhibit C**, ¶¶12, 18.

35. Boganski grieved the suspension through arbitration.  See **Exhibit A**, p. 107.

36. The arbitrator ruled in favor of the Board of Education and upheld the suspension.  See **Exhibit A**, p. 129; **Exhibit I**.

37. In response to Boganski's complaint that he was being harassed by the Administration, the arbitrator astutely noted that:

It is not credible that there would have been a conspiracy among two

principals [Pierce and Villar], a Manager of Buildings and Grounds [Cordani], and an Assistant Superintendent [Lamontagne] just to get the Grievant [Boganski] suspended for three days.

See **Exhibit I**, p. 29.

38. Glen Lamontagne had spoken to Boganski for six to eight months regarding Boganski ensuring that other custodians received the controlled air computer training. See **Exhibit A**, pp. 105-108; **Exhibit F**, ¶10.

39. John Cordani gave Boganski a directive to see that the custodian training take place on the controlled air computer system. See **Exhibit A**, pp. 106, 108; **Exhibit D**, ¶17.

40. Jeffrey Villar directed Boganski to get the other custodians trained on the computer system. See **Exhibit A**, pp. 106, 108-109; **Exhibit C**, ¶13.

41. Despite these directives from three separate supervisors, Boganski did not get the other custodians trained at any time prior to his suspension. See **Exhibit A**, pp. 106, 109-111; **Exhibit C**, ¶13; **Exhibit D**, ¶17; **Exhibit F**, ¶10.

42. The Sonitrol list at issue contained the security codes for employees to access the building. See **Exhibit A**, p.111; **Exhibit J**.

43. Steve Papotto, a plumber, reported to the union president, Ricky Allen, that he had seen the Sonitrol list on Boganski's desk. See **Exhibit A**, p. 117.

44. Papotto also told Cordani that he had seen the Sonitrol list was on Boganski's desk. See **Exhibit D**, ¶19.

45. Cordani asked Papotto to copy the list and to give the copy to Villar. See **Exhibit D**, ¶19.

46. Villar asked Boganski if he had the list, and Boganski denied having it. See **Exhibit A**, p. 115; **Exhibit C**, ¶14.

47. The list was addressed to the attention of Edward Boganski. See **Exhibit A**, p. 115.

48. Villar and Cordani found the list in Boganski's office. See **Exhibit A**, p. 117; **Exhibit C**, ¶14; **Exhibit D**, ¶20.

49. Villar has no knowledge of anyone "planting" the list in Boganski's office. See **Exhibit A**, pp. 118-19; **Exhibit C**, ¶14.

50. Cordani has no knowledge of anyone "planting" the list in Boganski's office. See **Exhibit A**, pp. 118-19; **Exhibit D**, ¶18.

51. Cordani did not recommend or authorize the suspension that was given to Boganski on December 23, 1999. See **Exhibit D**, ¶16.

52. In February 2000, Boganski was transferred to a night custodian position at Thomas Hooker School. See **Exhibit A**, pp. 21, 133-34.

53. The union president, Kathleen McParland, and another union representative, raised the issue of the transfer with the Meriden Public Schools and asked if Boganski could move to the open position. See **Exhibit K**, pp. 67-69, 72.

54. Villar was not satisfied with Boganski's work performance, primarily due to

Boganski's lack of judgment and his trouble managing the custodians under him.  See **Exhibit C**, ¶¶15, 16.

55. The custodians at Washington Middle School were not cooperating with each other, and as a result, work was not getting done.  See **Exhibit K**, pp. 43-44; **Exhibit D**, ¶23.

56. The union drafted a letter of agreement regarding the transfer, and Boganski signed the document.  See **Exhibit A**, pp. 134-36; **Exhibit K**, p. 71.

57. McParland spoke with Glen Lamontagne regarding Boganski's employment around the time of Boganski's move to Thomas Hooker.  Lamontagne was positive about Boganksi's future with the Board of Education, and "caring."  See **Exhibit K**, pp. 95-96.

58. Cordani did not recommend or authorize Boganski's transfer to Thomas Hooker School.  See **Exhibit D**, ¶21.

59. On December 3, 2001, Boganski was promoted to another head custodian position at Benjamin Franklin School.  See **Exhibit A**, p. 25; **Exhibit B**, No. 1; **Exhibit L**.

60. Cordani did not have the authority to issue a suspension, to fire, or to transfer Boganski to another position.  See **Exhibit D**, ¶24.

DEFENDANTS,
CITY OF MERIDEN BOARD OF
EDUCATION AND JOHN CORDANI


By/s/Alexandria L. Voccio
   Alexandria L. Voccio
   ct21792
   Howd & Ludorf, LLC
   65 Wethersfield Avenue
   Hartford, CT  06114
   (860) 249-1361
   (860) 249-7665 (Fax)
   E-Mail: avoccio@hl-law.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 29th day of April, 2005.

John R. Williams
Katrena Engstrom
51 Elm Street
New Haven, CT  06510

Michael McKeon
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, CT  06105-4286

Deborah L. Moore
City of Meriden
Department of Law
142 East Main Street
Meriden, CT  06450

/s/Alexandria L. Voccio
Alexandria L. Voccio