UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWARD BOGANSKI | : | NO.:  3:01CV2183 (AVC) |
| | : | |
| v. | : | |
| | : | |
| CITY OF MERIDEN BOARD OF | : | |
| EDUCATION AND JOHN CORDANI | : | APRIL 29, 2005 |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**I.     BACKGROUND**:

The plaintiff, Edward Boganski, initiated this action by way of a two-count

complaint, dated November 21, 2001, seeking to recover damages from the City of

Meriden Board of Education, his employer, and John Cordani, the Manager of

Buildings and Grounds for the Meriden Public Schools.  The plaintiff alleges that the

defendants retaliated against him for having exercised his right to free speech as

guaranteed by the First Amendment to the United States Constitution and the

Connecticut State Constitution.  Count One alleges a violation under 42 U.S.C. §1983.

Count Two alleges a violation of Connecticut General Statute §31-51q.  The

defendants, City of Meriden Board of Education and John Cordani, hereby move for

summary judgment as to both counts.

Edward Boganski began working for the Meriden Public Schools on August 30,

1993, as a night custodian at Pulaski School.  <u>See</u> Complaint, ¶6; Plaintiff's Deposition Transcript, p. 11, attached as **Exhibit A**; Plaintiff's Interrogatory Responses, No. 5, attached as **Exhibit B**.  Boganski subsequently applied for, and was given, the position of van driver/custodian.  <u>See</u> Complaint, ¶6; and **Exhibit A**, p. 14.  In this position, Boganski delivered mail to the schools and performed custodial work at the Board of Education building.  <u>See</u> **Exhibit A**, p. 14.

In October 1997, Boganski was promoted to the head custodian position at Washington Middle School.  <u>See</u> Complaint, ¶6; and **Exhibit A**, p. 15.  Boganski interviewed for the head custodian position with Shellie Pierce, the school Principal, and John Cordani, Manager of Buildings and Grounds.  <u>See</u> **Exhibit A**, p. 16.  Pierce was Boganski's immediate supervisor at Washington Middle School through June 1999.  At that time, Dr. Jeffrey Villar, the new Assistant Principal, became his immediate supervisor.  <u>See</u> **Exhibit A**, p. 17; and Villar Affidavit, attached as **Exhibit C**, ¶5.  In addition, Boganski, like all head custodians, reported to Cordani as needed. <u>See</u> **Exhibit A**, pp. 17-18.

Boganski alleges that he engaged in conduct protected by the First Amendment in October 1999, with respect to an incident surrounding the purchase of fuel oil for Washington Middle School.  <u>See</u> **Exhibit B**, No. 23.  Boganski called the vendor that the Meriden Public Schools used for fuel oil, and was told that he needed a purchase order.  <u>See</u> Complaint, ¶8; **Exhibit A**, pp. 41-42.  At the time, the Meriden Public

2

Schools was using a new vendor; purchase orders had not been required in the past.
<u>See</u> Cordani Affidavit, ¶7, attached as **Exhibit D**; and Figura Affidavit, ¶6, attached as
**Exhibit E**.

Boganski immediately called Cordani who allegedly told Boganski to make up a
purchase order number.[1] <u>See</u> Complaint, ¶9; **Exhibit A**, pp. 41-49. Boganski
responded, "I don't know about that. What are you talking about?" <u>See</u> **Exhibit A**,
p. 49. Cordani allegedly responded, "Make up a number, birthday, whatever. I'll fix it,
when it comes down here, I'll fix it." <u>See</u> **Exhibit A**, p. 49. Boganski was not satisfied
with that response and purportedly called Cordani again the next day. <u>See</u> **Exhibit A**,
pp. 41-50.

During the second conversation, Boganski alleges that he again told Cordani
that he needed the oil. <u>See</u> **Exhibit A**, p. 51. Cordani responded that he would take
care of it when it came down to the office and for Boganski to call the vendor back and
give the company a purchase order number. <u>See</u> **Exhibit A**, p. 51. Cordani admits
that he told Boganski to give the vendor a purchase order number. <u>See</u> Cordani
Affidavit, **Exhibit D**, ¶¶5, 6.

Boganski then located Villar and told him that Cordani had asked him to make
up a purchase order. <u>See</u> Complaint, ¶11, **Exhibit A**, pp. 51-52; **Exhibit B**, No. 23;

---

[1] The defendants deny that Cordani's direction was anything but perfectly legal and appropriate. <u>See</u>
**Exhibit C**, ¶¶6, 7; **Exhibit D**, ¶¶6, 12; **Exhibit E**, ¶10; and **Exhibit F**, ¶6.

and **Exhibit C**, ¶6.  According to Boganski, Villar responded, "It sounds kind of shady to me.  Call [Cordani] back and just tell him that you are not going to do that, he needs to give you a number."  <u>See</u> **Exhibit A**, p. 52.  Villar denies saying that Cordani's directive was shady.  <u>See</u> **Exhibit C**, ¶6.  Villar did tell Boganski that he needed to resolve the situation directly with Cordani.  <u>See</u> **Exhibit C**, ¶6.  Villar did not perceive Cordani's request as improper or shady.  <u>See</u> **Exhibit C**, ¶¶6, 7.  Villar never spoke with Cordani regarding the purchase order incident, or Boganski's complaint, prior to this litigation.  <u>See</u> **Exhibit C**, ¶9; and **Exhibit D**, ¶13.

Boganski allegedly called Cordani back again the following day.  <u>See</u> Complaint, ¶6, **Exhibit A**, p. 53.  Boganski told Cordani that he had apprised Villar of the situation, and that he himself did not feel comfortable making up a purchase order number.  <u>See</u> **Exhibit A**, p. 54.  Cordani allegedly responded by calling Boganski an asshole and slamming the telephone down.  <u>See</u> Complaint, ¶10; **Exhibit A**, p. 54.  According to Cordani, he initiated the call to Boganski, after being out of the office for two days, to find out why Boganski had not given the vendor a purchase order number.  <u>See</u> **Exhibit D**, ¶¶8-9.  Cordani admits that Boganski told him that he felt uncomfortable giving the vendor a purchase order number, and that he in turn hung up the phone without saying goodbye to Boganski.  <u>See</u> **Exhibit D**, ¶9.

Boganski thereafter called Glen Lamontagne, the Assistant Superintendent.  <u>See</u> **Exhibit A**, p. 54; and Lamontagne Affidavit, attached as **Exhibit F**, ¶5.  Boganski

explained that Cordani had yelled at him because he had refused to make up a purchase order number.  See **Exhibit A**, p. 54.  Lamontagne repeatedly told Boganski to calm down and advised him that he would take care of it.  See **Exhibit A**, p. 54-56. Lamontagne subsequently spoke with Cordani and advised him to make sure that if fuel oil was needed that it be delivered.  See **Exhibit F**, ¶7.  Ultimately, Cordani's assistant, Catherine Figura, called the vendor and gave the company a purchase order number.  See **Exhibit D**, ¶10; and **Exhibit E**, ¶9.  Oil arrived the next day.  See **Exhibit A**, p. 54.  Lamontagne did not perceive Cordani's request as improper.  See **Exhibit F**, ¶6.  The phrase "make up a purchase order" is used interchangeably with "issue a purchase order."  See **Exhibit C**, ¶7; and **Exhibit F**, ¶6.

According to the plaintiff's interrogatory responses, Boganski reported the purchase order incident to Villar on October 12, 1999.  See **Exhibit B**, No. 23. Boganski had gone to both Villar and Lamontagne in an effort to obtain the fuel oil. See **Exhibit A**, pp. 53-55.  Boganski had refused to make up a purchase order and he needed assistance in getting the oil.  See **Exhibit A**, pp. 55-56.  Boganski was not seeking to get Cordani reprimanded or fired.  See **Exhibit A**, pp. 53-54.  Boganski never considered going to the police to report what he allegedly believed to be an illegal request, nor did he ever consider going to the press.  See **Exhibit A**, p. 305.  He never formed an opinion as to whether or not Cordani was attempting to obtain fuel oil without the Board of Education paying for it.  See **Exhibit A**, p. 202.

Boganski contends that as a result of his complaint to Jeffrey Villar, he was retaliated against in the form of memos, a suspension, and a demotion[2].  See **Exhibit A**, p. 64; and **Exhibit B**, No. 24.

The alleged retaliatory memos were issued by Jeffrey Villar.  See **Exhibit A**, pp. 64-68.  Villar became the Assistant Principal at Washington Middle School on July 1, 1999.  See **Exhibit A**, p. 70; and **Exhibit C**, ¶4.  The school year commenced in late August or early September.  See **Exhibit A**, p. 70.  Boganski began receiving memos from Villar that were critical of his work performance as early as September 7, 1999, a month prior to Boganski's complaint.  See **Exhibit A**, pp. 77-79; and **Exhibit C**, ¶11.  Some of Villar's memos were critical; others simply provided directives to Boganski as the head custodian.  See **Exhibit C**, ¶11; and September 1999 Memos, attached as **Exhibit G**.  Cordani did not direct, or otherwise pressure, Villar to issue the memos.  See **Exhibit C**, ¶17; and **Exhibit D**, ¶15.

Boganski contends that he received "a lot more" memos after his complaint regarding Cordani.  See **Exhibit A**, pp. 79-80.  Villar denies any correlation.  See **Exhibit C**, ¶¶11, 18.

On December 23, 1999, Boganski was suspended for three days (December 28, 29 & 30, 1999) without pay.  See Complaint ¶15, **Exhibit A**, p. 104.  Shellie Pierce,

---

[2] Boganski was transferred to the night custodian position in February 2000, not October 1999 as set forth in response to interrogatory No. 24.  See **Exhibit A**, pp. 133-34; and **Exhibit B**, No. 25.

in consultation with Jeffrey Villar and Glen Lamontagne, issued the suspension.  See

**Exhibit B**, No. 25; and 12/23/99 Memos re Meeting, attached as **Exhibit H**.  Cordani

did not recommend or authorize the suspension.  See **Exhibit D**, ¶16.  The

suspension was given for two reasons: (1) Boganski's failure to obtain training for the

custodians under him on the controlled air computer system, despite directives to do

so, and (2) his lying about the possession of a Sonitrol list.  See **Exhibit A**, p. 105; and

**Exhibit C**, ¶¶12, 18.

Boganski grieved the suspension through arbitration.  See **Exhibit A**, p. 107.

The arbitrator ruled in favor of the Board of Education and upheld the suspension.

See **Exhibit A**, p. 129; and Arbitration Award, attached as **Exhibit I**.  In response to

Boganski's complaint that he was being harassed by the Administration, the arbitrator

astutely noted that:

> It is not credible that there would have been a conspiracy among two
> principals [Pierce and Villar], a Manager of Buildings and Grounds
> [Cordani], and an Assistant Superintendent [Lamontagne] just to get the
> Grievant [Boganski] suspended for three days.

See **Exhibit I**, p. 29.

As for the training of other custodians, it is undisputed that Glen Lamontagne

had spoken to Boganski for six to eight months regarding Boganski ensuring that other

custodians received the controlled air computer training.  See **Exhibit A**, pp. 105-108;

and **Exhibit F**, ¶10.  It is undisputed that John Cordani also gave Boganski a directive

to see that the custodian training take place.  See **Exhibit A**, pp. 106, 108; and

**Exhibit D**, ¶17.  It is likewise undisputed that Jeffrey Villar directed Boganski to get the

other custodians trained on the computer system.  See **Exhibit A**, pp. 106, 108-109;

and **Exhibit C**, ¶13.  Despite these directives from three separate supervisors,

Boganski did not get the other custodians trained at any time prior to his suspension.

See **Exhibit A**, pp. 106, 109-111; **Exhibit C**, ¶13; **Exhibit D**, ¶17; and **Exhibit F**, ¶10.

The Sonitrol list at issue contained the security codes for employees to access

the building.  See **Exhibit A**, p.111; and Sonitrol list, attached as **Exhibit J**.  Steve

Papotto, a plumber, reported to the union president that he had seen the Sonitrol list

on Boganski's desk.  See **Exhibit A**, p. 117.  Papotto also called Cordani and told him

that the list was on Boganski's desk.  See **Exhibit D**, ¶19.  Cordani told Papotto to

copy the list and give the copy to Villar.  See **Exhibit D,** ¶19.  Villar asked Boganski if

he had the list, and Boganski denied having it.  See **Exhibit A**, p. 115; and **Exhibit C**,

¶14.  The list was addressed to the attention of Edward Boganski.  See **Exhibit A**,

p. 115.  Boganski claims that he gave the list to Shellie Pierce.  See **Exhibit A**,

pp. 115-16.  However, Villar and Cordani found the list in Boganski's office.  See

**Exhibit A**, p. 117; **Exhibit C**, ¶14; and **Exhibit D**, ¶20   Boganski speculates that the

list was "planted" on his desk by Papotto, but he has no evidence to support his

theory.  See **Exhibit A**, p. 118-19.  Moreover, there is no evidence that Cordani or

Villar or Lamontagne had any involvement in "planting" the list, or that they were aware

that the list was "planted."  <u>See</u> **Exhibit C**, ¶14; and **Exhibit D**, ¶18.

In February 2000, Boganski was transferred to a night custodian position at Thomas Hooker School.  <u>See</u> **Exhibit A**, pp. 21, 133-34.  The union president, Kathleen McParland, and another union representative, raised the issue of the transfer with the Meriden Public Schools and asked if Boganski could move to the open position.  <u>See</u> McParland's deposition transcript, attached as **Exhibit K**, pp. 67-68, 72. According to McParland, she made this recommendation based on a conversation with Cordani in which she was advised that the administration at Washington Middle School was not happy with Boganski's work, and that Boganski would be fired if he remained in his current position.  <u>See</u> **Exhibit K**, pp. 49-50, 67-69.  Cordani denies telling McParland that Boganski would be fired if he did not leave Washington Middle School; Cordani did tell her that Boganski needed to do his job wherever he was.  <u>See</u> **Exhibit D**, ¶22.  Indeed, Jeffrey Villar was not satisfied with Boganski's work performance, primarily due to Boganski's lack of judgment and his trouble managing the custodians under him.  <u>See</u> **Exhibit C**, ¶¶15, 16.  The custodians complained to Cordani regarding Boganski's lack of assistance in getting work done.  <u>See</u> **Exhibit D**, ¶23.  As union president, McParland acknowledged that the custodians at Washington Middle School were not cooperating with each other, and that as a result, work was not getting done.  <u>See</u> **Exhibit K**, pp. 43-44.

The union drafted a letter of agreement regarding the transfer, and Boganski

signed the document.  See **Exhibit A**, pp. 134-36; and **Exhibit K**, p. 71.  Cordani did

not recommend or authorize the transfer.  See **Exhibit D**, ¶21.

McParland spoke with Glen Lamontagne regarding Boganski's employment

around the time of Boganski's move to Thomas Hooker.  See **Exhibit K**, p. 95.

Lamontagne was positive about Boganksi's future with the Board of Education, and

"caring."  See **Exhibit K**, pp. 95-96.  Lamontagne indicated that:

> Eddie got the job because he was good at what he did and that he had a
> future with the Board of Ed and that just because this didn't work out didn't
> mean that something else wouldn't work out and that Eddie needed to
> take care of himself and just move on from this situation.

See **Exhibit K**, pp. 95-96.

Indeed, on December 3, 2001, Boganski was again promoted to another head

custodian position at Benjamin Franklin School.  See **Exhibit A**, p. 25; **Exhibit B**, No.

1; and Roy 11/21/01 Letter, attached as **Exhibit L**.

Cordandi had no authority to suspend Boganski, fire him, or transfer him to

another school.  See **Exhibit D**, ¶24.

## II.     SUMMARY JUDGMENT STANDARD

The court shall render summary judgment when the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Anderson v. Liberty

Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  A factual dispute is considered "genuine" when the evidence is such that a reasonable jury can return a verdict for the non-moving party.  See Anderson, 477 U.S. at 247-48.  A "material fact" is one whose resolution will affect the ultimate determination of the case.  See id. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims… and it should be interpreted in a way that allows it to accomplish this purpose."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  See Anderson, 477 U.S. at 255.  However, "[t]he mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  Hayut v. State University of New York, 352 F.3d 733, 743 (2nd Cir. 2003).  "[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Caldarola v. Calabrese, 298 F.3d 156, 160 (2nd Cir. 2002), quoting, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986) (underline in original).  A non-moving party may not rely on mere allegations, legal conclusions, unsupported statements, or a denial of the pleadings.  See Celotex Corp., 477 U.S. at 327.

"[A] plaintiff must do more than wet the curiosity of the court; he must support vague accusation and surmise with concrete particulars." Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2nd Cir. 1970). "The opposing party is entitled to the benefit of all favorable inferences which can be drawn from the underlying facts; however, only *reasonable* inferences will be drawn, not every conceivable inference." DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987). "[T]he inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind …." NLRB v. Martin A Gleason, Inc., 534 F.2d 466, 474 (2nd Cir. 1976).

Hearsay that does not fall under one or more of the exceptions set forth in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598 (1970).

**III.**     **LAW AND ARGUMENT**:

   **A.**     **The Defendants Are Entitled To Summary Judgment As To Plaintiff's First Amendment Retaliation Claim**.

In order to survive summary judgment on his First Amendment retaliation claim, the plaintiff must advance non-conclusory allegations establishing that: (1) the speech or conduct at issue is constitutionally protected, (2) he was subjected to an adverse employment action, and (3) there was a causal connection between the protected speech and the adverse action, "so that it can be said that [the plaintiff's] speech was

a motivating factor in the [action]." Morris v. Lindau, 196 F.3d 102 (2nd Cir. 1999),

citing, Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87, 97

S.Ct. 568 (1977); see also, Dawes v. Walker, 239 F.3d 489, 492 (2nd Cir. 2001). If the

plaintiff can show that his exercise of constitutionally protected conduct was a

motivating or substantial factor behind the adverse employment action, then the

burden shifts to the defendant employer to show that it would have reached the same

decision even in the absence of the protected conduct. See Mount Healthy, 429 U.S.

at 287. The United States Supreme Court noted that:

> The constitutional principal at stake is sufficiently vindicated if such an
> employee is placed in no worse a position than if he had not engaged in
> the conduct. A borderline or marginal candidate should not have the
> employment question resolved against him because of constitutionally
> protected conduct. But the same candidate ought not to be able, by
> engaging in such conduct, to prevent his employer from assessing his
> performance record and reaching a decision not to rehire on the basis of
> that record, simply because the protected conduct makes the employer
> more certain of the correctness of its decision.

Mount Healthy, 429 U.S. at 285-86.

In this case, the defendants are entitled to summary judgment for the following

six reasons: (i) the plaintiff's "speech" was not protected under the First Amendment;

(ii) there is no evidence that John Cordani subjected the plaintiff to an adverse

employment action; (iii) there is no evidence of a causal connection between the

plaintiff's claimed protected speech and an adverse employment action; (iv) the

defendants would have taken the same actions against Boganski even in the absence

of the alleged protected conduct; (v) John Cordani is entitled to qualified immunity; and (vi) the Meriden Board of Education may not be vicariously liable for the actions of its employees.

### 1. The Plaintiff's "Speech" Was Not Protected Under The First Amendment.

In determining a public employee's First Amendment rights, the Court must seek "a balance between the interest of the [employee], as a citizen, commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142, 103 S.Ct. 1684 (1983), quoting, Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731 (1968). "A public employee's right to freedom of speech is not absolute." Burnham v. Litt, 79 F. 3d 318 (2nd Cir. 1996). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest,…a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 461 U.S. at 147; Burnham, supra. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement…." Connick, 461 U.S. at 147-48.

Speech is protected only when an employee is acting as a citizen on a matter of

public concern. "[T]he fact that an employee's speech touches on matters of public concern will not render that speech protected where the employee's <u>motive</u> for the speech is private and personal." <u>Blum v. Schiegel</u>, 18 F.3d 1005 (2nd Cir. 1994) (underline added). "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." <u>Connick</u>, 461 U.S. at 149. Fortunately, this is not the case. When an employee speaks out only upon matters of personal interest, that employee may not rely on the First Amendment to protect him from a subsequent personnel decision that was allegedly taken in response to his conduct. <u>See</u>, <u>Connick</u>, 461 U.S. at 147.

      In the instant case, Boganski spoke out only on a matter of private interest. Specifically, Boganski identifies only one instance of claimed protected conduct – his report to Jeffrey Villar, Assistant Principal, that John Cordani, the Manager of Buildings and Grounds, had instructed him to make up a purchase order number. <u>See</u> **Exhibit B**, No. 23. After allegedly being instructed to make up a purchase order number, Boganski went to Villar for help in getting the oil. <u>See</u> **Exhibit A**, pp. 53-54. During a subsequent call with Cordani, Cordani allegedly swore at Boganski and slammed down the phone. <u>See</u> **Exhibit A**, p. 54. Boganski then complained to Glen Lamontagne, Assistant Superintendent. <u>See</u> **Exhibit A**, p. 54. Boganski still needed assistance in getting the oil. <u>See</u> **Exhibit A**, pp. 55-56. Boganski testified regarding

his motivations as follows:

> Q.    Why did you go to Mr. Villar?
>
> A.    Because he was the assistant principal and they put him in charge of me at the time, of the school.
>
> Q.    So you were going to him as your supervisor to what, give you advice?
>
> A.    Correct.
>
> Q.    Were you trying to get Mr. Cordani reprimanded or fired?
>
> A.    No.
>
> Q.    What were you seeking?
>
> A.    For somebody to give a purchase order number, because I wasn't going to do it.

See **Exhibit A**, p. 53.

> Q.    Why did you go to Mr. Lamontagne?
> . . .
>
> A.    Because he is John Cordani's boss.
>
> Q.    Okay.  Did you go to Mr. Lamontagne because you wanted John reprimanded or disciplined?
>
> A.    No, I wanted --
>
> Ms. Engstrom: Objection to the form.
>
> A.    That is okay.  I wanted the oil.  I just wanted the oil.
>
> Q.    Okay.  You wanted someone, whether or not it be Mr. Villar or Mr. Lamontagne, to help you out getting the oil?

A.    Get the purchase order number, because I wasn't doing it.

Q.    So you could get the oil?

A.    Correct.

<u>See</u> **Exhibit A**, pp. 54-55.  Boganski never considered going to the police to report what he allegedly believed to be an illegal request, nor did he ever consider going to the press.  <u>See</u> **Exhibit A**, p. 305.  Given that Boganski's complaint was motivated by a personal job-related interest, and not by a desire to speak out on a matter of public concern, his complaint is not afforded First Amendment protection.  <u>See</u>, <u>Connick</u>, 461 U.S. at 147; <u>See</u> <u>e.g.</u>, <u>Saulpaugh v. Monroe Community Hosp.</u>, 4 F.3d 134 (2nd Cir. 1993) (internal complaint of sexual harassment was motivated by individual employment situation and therefore not protected under First Amendment); <u>Auriemma v. Rice</u>, 895 F.2d 338 (2nd Cir. 1990) (filing a civil rights action is not protected by the First Amendment unless suit itself is a matter of public concern); <u>Yatvin v. Madision Metropolitan School Dist.</u>, 840 F.2d 412 (7th Cir. 1988) (sex discrimination lawsuit is not a matter of public concern where the plaintiff did not attempt to debate the issue of sex discrimination and failed to distinguish her case from any other single plaintiff discrimination case); <u>Arringer v. Mayor of Baltimore</u>, 811 F. Supp. 1121 (D. Md. 1993) (individual employment claim for discrimination not a matter

of public concern).

### 2. There Is No Evidence That John Cordani Subjected The Plaintiff To An Adverse Employment Action.

Moreover, in this case, the named individual defendant was not the individual responsible for the alleged retaliatory conduct.  John Cordani did not issue the memos (which were not disciplinary in nature); he did not recommend or authorize the suspension; nor did he effectuate the plaintiff's transfer to Thomas Hooker School. Cordani had no authority to suspend Boganski, fire him, or transfer him to another school.  See **Exhibit D**, ¶24.  As such, Cordani cannot be subject to liability.  He did not retaliate against Boganski.

### 3. There Is No Evidence Of A Causal Connection Between The Plaintiff's Claimed Protected Speech And An Adverse Employment Action.

Assuming *arguendo*, that the plaintiff was engaged in protected speech and that he suffered an adverse employment action, his First Amendment retaliation must nonetheless fail because the plaintiff cannot establish the third element of a *prima facie* case.  In order to survive summary judgment, the plaintiff must present evidence of a causal connection "sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech."  Morris, 196 F.3d 102, *quoting*, Mount Healthy, 429 U.S. at 287;

see also, Washington v. County of Rockland, 373 F.3d 310, 321 (2nd Cir. 2004).  "To do so, plaintiff[] must aver some 'tangible proof' demonstrating that [his] protected speech animated [the adverse employment action]."  Id.  The plaintiff "may not rely on conclusory assertions of retaliatory motive."  Id.

In this case, the plaintiff has offered no evidence to support his theory of retaliation.  First, John Cordani was not the decision maker behind Boganski's suspension or his transfer to Thomas Hooker, and Cordani did not write the memos.  See **Exhibit D**, ¶¶15, 16, 21, 24.  Second, the plaintiff has offered no evidence, or even a plausible theory, as to why either Glen Lamontagne and/or Jeffrey Villar and/or anyone else would retaliate against him for his complaint against Cordani.

Boganski would like this Court to believe that the Assistant Superintendent, the Assistant Principal at Washington Middle School and the Manager of Buildings and Grounds, all worked together to get rid of him.  Again, the plaintiff has submitted no evidence of such a conspiracy, and the defendants submit that such a claim is preposterous.  In order to defeat summary judgment, a plaintiff "must support vague accusation and surmise with concrete particulars."  Applegate v. Top Associates, Inc., 425 F.2d 92, 96 (2nd Cir. 1970).  Boganski has failed to meet this burden.

> **4.     The Defendants Would Have Taken The Same Actions Against Boganski Even In The Absence Of The Alleged Protected Conduct.**

Assuming *arguendo* that the plaintiff can show that his exercise of alleged

constitutionally protected conduct was a motivating factor behind the memos, the suspension, and/or the transfer, the defendants are nonetheless entitled to summary judgment in their favor because these actions would have been taken even in the absence of Boganski's complaint.  Jeffrey Villar believed that Boganski failed to satisfactorily perform his job as head custodian of Washington Middle School.  See **Exhibit C**, ¶¶15-16.  Indeed, Villar began sending Boganski memos regarding his work performance and assignments that needed to be completed at least a month prior to Boganski's complaint.  See **Exhibit A**, pp. 77-79; **Exhibit C**, ¶11; and **Exhibit G**.  Villar was not satisfied with Boganski's work performance, primarily due to Boganski's lack of judgment and his trouble managing the custodians under him.  See **Exhibit C**, ¶¶15, 16; and **Exhibit G**.  As union president, Kathy McParland acknowledged that the custodians at Washington Middle School were not cooperating with each other, and that as a result, work was not getting done.  See **Exhibit K**, pp. 43-44.  The memos are reflective of work not getting done and Boganski's poor judgment.  See **Exhibit G**.

As for the suspension, it is undisputed that three separate supervisors, Glen Lamontagne, John Cordani and Jeffrey Villar, had all directed Boganski to arrange for the custodians under him to receive the controlled air computer training.  See **Exhibit A**, pp. 105-109; **Exhibit C**, ¶13; **Exhibit D**, ¶17; and **Exhibit F**, ¶10.  Despite these directives, Boganski failed to get the custodians trained at any time prior to his

suspension.  See **Exhibit A**, pp. 106, 109-111; **Exhibit C**, ¶13; **Exhibit D**, ¶17; and

**Exhibit F**, ¶10.  It is also undisputed that Boganski denied having the Sonitrol list.  See

**Exhibit A**, p. 115; and **Exhibit C**, 14.  The list, however, was found in Boganski's

office.  See **Exhibit A**, p. 117; **Exhibit C**, ¶14; and **Exhibit D**, ¶20.  Boganski grieved

his suspension to arbitration, and the suspension was upheld.  See **Exhibit A**, p. 129;

**Exhibit I**.  Although the arbitration decision is not binding on this Court with respect to

the plaintiff's First Amendment claim, the decision and findings of facts are certainly

probative of the basis for the suspension at issue and the conduct of the parties.

### 5.    John Cordani Is Entitled To Qualified Immunity.

Defendant John Cordani is also entitled to summary judgment on the grounds

of qualified immunity.  The federal doctrine of qualified immunity will protect municipal

employees acting in their official capacity against §1983 suits unless their actions

violate clearly established constitutional or statutory rights <u>and</u> a reasonable official in

the same position would have known that the challenged conduct violated that

established right.  See <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).

The defense is "an immunity from suit rather than a mere defense to liability; and like

an absolute immunity, it is effectively lost if a case is erroneously permitted to go to

trial."  <u>Saucier v. Katz</u>, 533 U.S. 194, 200-201, 121 S.Ct. 2151 (2001), *quoting*, <u>Mitchell</u>

<u>v. Forsyth</u>, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).

The summary judgment standard to be applied in cases involving the affirmative defense of qualified immunity was articulated in <u>Lennon v. Miller</u>, 66 F.3d 416, 422 (2nd Cir. 1995), as follows:

> To establish qualified immunity, a defendant must demonstrate either that his conduct did not violate any of the plaintiff's...clearly established rights, ...that would have been known to a reasonable person or that it was objectively reasonable for him to believe that his...actions did not violate any of those clearly established rights.

<u>Lennon</u>, 66 F.3d at 422.  The availability of this defense does not depend on whether the plaintiff's rights were in fact violated.  <u>See id</u>.  "Even where a right is clearly established, a defendant may enjoy immunity if it was objectively reasonable for the official to believe that his acts did not violate that right."  <u>Kaluczky v. City of White Plains</u>, 57 F.3d 202 (2nd Cir. 1995).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  <u>Saucier</u>, 533 U.S. at 202.  "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  <u>Id</u>.

The Second Circuit has held that, in order for a constitutional right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right."  <u>Schecter v. Comptroller of the City of New York</u>, 79 F.3d 265, 270 (2nd Cir. 1996), *quoting*, <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). The Court set forth three factors

that are relevant to making this determination: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Id. at 271.

In this case, the plaintiff's internal complaints to Assistant Superintendent Glen Lamontagne and Assistant Principal Jeffrey Villar were not clearly established as protected speech. See Saulpaugh v. Monroe Community Hosp., 4 F.3d 134 (2nd Cir. 1993). In Saulpaugh, the Second Circuit Court of Appeals concluded that the plaintiff's internal complaint of sexual harassment did not invoke protection under the First Amendment because her complaints were "personal in nature and generally related to her own situation." Id. at 143, citing, Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2nd Cir. 1990). The Court noted that there was no indication that the plaintiff sought "relief against pervasive or systemic misconduct by a public agency or public officials, " or that her complaint was "part of an overall effort…to correct allegedly unlawful practices or bring them to public attention." Saulpaugh, 4 F.3d at 143, citing, Yatvin v. Madison Metro. School Dist., 840 F.2d 412, 420 (7th Cir. 1988).

Similarly, in this case, there is no indication that the plaintiff was motivated by any public interest; Boganski was concerned merely with his own employment situation. Boganski claims that what Cordani asked him to do was illegal, but he did

not contact the police; he did not contact a newspaper; he did not even seek to have

Cordani reprimanded.  He did not seek justice; instead, he simply sought advice and

help in doing his job, specifically assistance in purchasing fuel oil for the school.

Boganski's complaints to Villar and Lamontagne were simply internal complaints or

grievances regarding his own employment situation.  At the very least, it was

objectively reasonable for Cordani to believe that he was not violating any of the

plaintiff's clearly established rights under these circumstances.  See Saulpaugh, supra.

The law does not require municipal employees to guess or speculate as to the state of

the law.  On the contrary, where as here, the subject matter of the plaintiff's claim was

not clearly established as protected speech, the defendant is entitled to summary

judgment.

> **6.    The Meriden Board Of Education May Not Be Vicariously
> Liable For The Acts Of Its Employees.**

In Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018,

2036 (1978), the United States Supreme Court held that "a local government may not

be sued under §1983 for an injury inflicted solely by its employees or agents."   In

other words, a municipality cannot be liable pursuant to a theory of *respondeat*

*superior* for actions committed by its employees.  See id.  To hold a municipality liable

in such an action, the plaintiff is required to plead and prove the existence of: (i) an

official policy, practice or custom (ii) that causes the plaintiff to be subjected (iii) to a

denial of a constitutional right.  See Zahra v. Town of Southold, 48 F.3d 674, 685 (2nd

Cir. 1995); Batista v. Rodriguez, 702 F.2d 393, 397 (2nd Cir. 1983); Ricciuti v. New

York City Transit Auth., 941 F.2d 119, 122 (2nd Cir. 1991); see also, City of St. Louis v.

Praprotnik, 485 U.S. 112, 128 (1988).  "The mere assertion … that a municipality has

such a custom or policy is insufficient in the absence of allegations of fact tending to

support, at least circumstantially, such an inference."  Zahra, 48 F.3d at 685, *quoting*,

Dwares v. City of New York, 985 F.2d 94, 100 (2nd Cir. 1993).  There are no such

allegations of fact in this case.

The plaintiff never alleges, nor can he ethically maintain, that the Meriden Board

of Education was the "moving force" behind the claimed injury.  See Board of the

County Comm'rs. of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).  As

such, the Board is entitled to summary judgment.

## B.    The Defendants Are Entitled To Summary Judgment As To Plaintiff's Conn. Gen. Stat. §31-51q Claim.

The plaintiff's statutory claim must also fail.  Connecticut General Statutes § 31-

51q provides, in pertinent part, that:

> Any employer, including the state and any instrumentality or political
> subdivision thereof, who subjects any employee to discipline or discharge
> on account of the exercise by such employee of rights guaranteed by the
> first amendment to the United States Constitution or section 3, 4 or 14 of
> article first of the Constitution of the state,…shall be liable to such
> employee for damages caused by such discipline or discharge....

Conn. Gen. Stat. §31-51q.

The defendants are entitled to summary judgment as to this claim for the following four reasons: (i) the plaintiff's "speech" was not protected under the First Amendment or an equivalent provision of the State constitution; (ii) there is no evidence of a causal connection between the claimed protected speech and any discipline received; (iii) the defendants would have taken the same actions against Boganski even in the absence of the alleged protected conduct; and (iv) John Cordani may not be individually liable under the statute.

> **1.  The Plaintiff's Speech Was Not Protected By The First Amendment Or Equivalent Provisions Of The State Constitution**

In order to prevail on a §31-51q claim, the plaintiff must prove that: (1) he was exercising rights protected by the first amendment to the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) he was fired or disciplined on account of his exercise of such rights; and (3) his exercise of his first amendment or equivalent state constitutional rights did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer.  See Barlow v. Connecticut, 319 F. Supp.2d 250, 265 (D. Conn. 2004); MacKay v. Rayonier, Inc., 75 F. Supp.2d 22, 29 (D. Conn. 1999); and Vince v. Worrell, Superior Court, Judicial District of Hartford-New Britain at Hartford, No. 319386 (Jul. 14, 1992) (Schaller, J.) (Vince v. Morrell attached as **Exhibit M**).

In this case, summary judgment should be granted because the plaintiff was not engaged in conduct protected by the First Amendment or equivalent provisions in the State constitution.  There are no allegations of fact that Boganski spoke out anywhere but at work during working hours, or that his speech extended beyond his own employment situation.  See Rashka v. Griffin Hospital, 841 F. Supp. 468, 474 (D. Conn. 1994).  The defendants incorporate §A1 herein.

> **2.    There Is No Evidence Of A Causal Connection Between The Plaintiff's Claimed Protected Speech And Any Discipline Received.**

There is no evidence that Boganski's complaint regarding the purchase order incident was a motivating factor behind the memos, the suspension or the transfer to Thomas Hooker School.  The plaintiff cannot rely on mere speculation that the Assistant Superintendent, an Assistant Principal and the Manager of Buildings and Grounds, would all conspire against him on account of a complaint that did not result in any disciplinary action or was otherwise embarrassing to the Board of Education.  The defendants incorporate §A3 herein.

> **3.    The Defendants Would Have Taken The Same Actions Against Boganski Even In The Absence Of The Alleged Protected Conduct.**

The defendants are entitled to summary judgment because the same actions would have been pursued even in the absence of Boganksi's complaint regarding the purchase order.  See Vince, supra, *citing*, Mount Healthy, 429 U.S. at 287.  The

memos and transfer resulted from concerns regarding Boganski's work performance, including his lack of professional judgment and his difficulty in supervising other custodians.  The suspension was based on Boganski's continued failure to follow a directive and his dishonesty.  The defendants incorporate §A4 herein.

### 4. Defendant Cordani Is Entitled To Summary Judgment Because There Is No Individual Liability Under §31-51q.

John Cordani is entitled to summary judgment as to Count Two because there is no individual liability under General Statute §31-51q.  Section 31-51q provides, in relevant part, that: "[a]ny <u>employer</u>... who subjects any employee to discipline or discharge... shall be liable to such employee for damages caused by such discipline or discharge.... "  Conn. Gen. Stat. §31-51q (underline added).  Cordani was not Boganski's employer.

IV.     **CONCLUSION**

For the foregoing reasons, the defendants, City of Meriden Board of Education

and John Cordani, are entitled to summary judgment in their favor.

DEFENDANTS,
CITY OF MERIDEN BOARD OF
EDUCATION AND JOHN CORDANI


By /s/Alexandria L. Voccio
    Alexandria L. Voccio
    ct21792
    Howd & Ludorf, LLC
    65 Wethersfield Avenue
    Hartford, CT  06114
    (860) 249-1361
    (860) 249-7665 (Fax)
    E-Mail: avoccio@hl-law.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been sent, handling charges prepaid, via U.S. Mail to the following counsel of record this 29th day of April, 2005.

John R. Williams
Katrena Engstrom
51 Elm Street
New Haven, CT  06510

Michael McKeon
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, CT  06105-4286

Deborah L. Moore
City of Meriden
Department of Law
142 East Main Street
Meriden, CT  06450

/s/Alexandria L. Voccio
Alexandria L. Voccio