1

```
                UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF CONNECTICUT

EDWARD BOGANSKI,
          Plaintiff
vs.                                  No: 3:01CV2183

CITY OF MERIDEN BOARD OF EDUCATION
AND JOHN CORDANI                     February 10, 2005
          Defendants.


              DEPOSITION OF EDWARD J. BOGANSKI, JR.


A P P E A R A N C E S:


     LAW OFFICES OF JOHN R. WILLIAMS
         Attorneys for the Plaintiff
         51 Elm Street
         New Haven, Connecticut 06510
     BY: KATRENA ENGSTROM, ESQ.
         (203) 562-9931


     HOWD & LUDORF
         Attorneys for the Defendants
         65 Wethersfield Avenue
         Hartford, Connecticut 06114
     BY: ALEXANDRIA L. VOCCIO, ESQ.
         (860) 249-1361




     Deborah L. Mills - Licensed Court Reporter Number 141
```

```
                                                              11
 1         Q.   And were you doing the same thing during that time,
 2   going into people's homes or businesses and cleaning?
 3         A.   Correct.
 4         Q.   What was your first job with Meriden?
 5         A.   With the Meriden Board of Education?
 6         Q.   Yes.
 7         A.   Where was it?
 8         Q.   What was your first job with the Meriden Board of
 9   Education?
10         A.   At Pulaski Elementary School.
11         Q.   What was your title?
12         A.   Custodian.
13         Q.   I know you told me, and I don't have it written
14   down here, when did you start with Meriden?  Oh, August 30,
15   '93?
16         A.   Uh-huh.
17         Q.   Yes?
18         A.   Yes.
19         Q.   You were head custodian?
20         A.   Correct.
21         Q.   Did you have to apply for that position?
22         A.   Yes, I did.
23         Q.   Do you recall what the application process
24   consisted of?
25         A.   I filled out a basic application.
```

14

1  A.   Actually, they didn't want me for that job, so they
2  broke my stones, so I didn't get the job but . . .
3  Q.   I thought you just said your next position was van
4  driver/custodian? So you did get the job?
5  A.   Oh, yeah.  Did I get it?  Yeah.
6  Q.   Okay.
7  A.   But --
8  Q.   Did you interview with anyone for that position?
9  A.   I believe it was Cordani and the head custodian,
10 Brian Karney.
11 Q.   The head custodian of what school?
12 A.   No, 22 Liberty Street.
13 Q.   Which is what?
14 A.   That's what it is called, the Board of Education
15 building.
16 Q.   You were the custodian at the Board of Education
17 building?
18 A.   Well, van driver/custodian.  My duties were
19 different.  I had to be on a schedule to go deliver mail
20 basically to other schools.
21 Q.   That is what you did as a van driver?
22 A.   Correct, and then if they needed custodial work,
23 like I cut the grass, and if somebody didn't show up I would
24 help, stay over and help clean the building.
25 Q.   Okay.  When you say "help clean?"

15

1   A.   Run errands.
2   Q.   Okay. When you say "help clean the building," you
3   mean the Board of Education building?
4   A.   The Board of Education building, correct.
5   Q.   Who is your supervisor as van driver/custodian?
6   A.   Brian Karney, the head custodian.
7   Q.   Did you also report to John Cordani at that time?
8   A.   If Brian Karney wasn't there I would. Most of the
9   time I took my instructions from him.
10  Q.   During what time period were you a van driver/
11  custodian?
12  A.   I don't remember the dates. I believe I went
13  through 1997 and I think I went to Washington.
14  Q.   You believe it was '97?
15  A.   Uh-huh.
16  Q.   What position did you hold at Washington?
17  A.   Head custodian.
18  Q.   That was Washington Middle School?
19  A.   Correct.
20  Q.   Was that the first time you had been a head
21  custodian?
22  A.   Yes.
23  Q.   Did you have to apply for that position?
24  A.   Yes.
25  Q.   What was the application process?

1  A.  Send a letter to the personnel director requesting
2  that I be considered for the position.
3  Q.  Okay. Who was the personnel director at that time?
4  A.  It was either Drake or Nappi (phonetic.) I don't
5  remember exactly who it was.
6  Q.  Did you have to interview with anyone?
7  A.  Yes.
8  Q.  Who?
9  A.  The principal.
10 Q.  Who was the principal?
11 A.  Shellie Pierce.
12 Q.  Did you interview with anyone else?
13 A.  And John Cordani, and I was the only applicant for
14 that position.
15 Q.  How do you know that?
16 A.  Because the union told me.
17 Q.  What were your duties as head custodian at
18 Washington Middle School?
19 A.  Some cleaning, supervising other custodians,
20 ordering supplies, taking care of payroll, basically a lot of
21 the paperwork that would come through as far as maintenance
22 goes.
23 Q.  Would you make any decisions regarding what
24 supplies needed to be ordered or would someone else make that
25 decision?

1    A.   I basically would make, for basic supplies I made
2 the decision, like as far as like if we needed bleach, soap,
3 Kleenex, toilet paper.
4    Q.   Okay.  What about any other items that you
5 considered not basic?
6    A.   If you needed, say, oil for the school, I would
7 call and get that.
8    Q.   You would call?
9    A.   The vendor.
10   Q.   Okay.  So you would make the decision if you needed
11 oil?
12   A.   Right.
13   Q.   Are there any supplies that you had to get
14 authorization for before ordering?
15   A.   No.
16   Q.   Who was your immediate supervisor when you were at
17 Washington Middle School?
18   A.   It was Shellie Pierce, the principal, and then
19 June, what was it, June or July of 1999 they put Dr. Villar
20 as my immediate supervisor.
21   Q.   Dr. Villar was the assistant principal, is that
22 correct?
23   A.   Yes, he just started in July of that year.
24   Q.   Did you report to John Cordani during this time, as
25 well?

18

```
 1    A.    Yes.
 2    Q.    Okay.  While you were at Washington Middle School
 3  who would be responsible for, say, your hours?  How was that
 4  determined?
 5    A.    Everybody works eight hours.
 6    Q.    Okay.  Is that under the collective bargaining
 7  agreement?
 8    A.    Uh-huh, yes. Sorry.
 9    Q.    So you were a member of the union as head
10  custodian?
11    A.    Yes, I was.
12    Q.    Are you still a member of the union?
13    A.    Yes, I am.
14    Q.    What is the name of the union?
15    A.    It's part of the Meriden Federation of Teachers.  I
16  don't know exactly the --
17    Q.    That is okay if you don't know.
18    A.    She has it there, Meriden Federation of Teachers.
19    Q.    Meriden Federation of Municipal Employees?
20    A.    There you go.
21    Q.    What was your salary when you first went to
22  Washington Middle School as head custodian, as you recall?
23    A.    Fifteen, sixteen dollars an hour.
24    Q.    Were you paid on an hourly basis?
25    A.    Correct.
```

```
                                                                    21
1       Q.   When did you become the night custodian?
2       A.   February of 2000.
3       Q.   And at what school?
4       A.   Thomas Hooker, that was the only place left for me
5    to go.
6       Q.   Who was your supervisor at Thomas Hooker?
7       A.   The principal.
8       Q.   Which was who?
9       A.   Cioffi, Cioffi and Dick Carrol.
10      Q.   Who is Dick Carrol?
11      A.   Dick Carrol was the head custodian.
12      Q.   As night custodian did you continue to work eight
13   hours a day?
14      A.   Eight hours an evening, yes.
15      Q.   Okay.  What were your duties as night custodian?
16      A.   Clean the classrooms, wash floors, clean bathrooms,
17   set up chairs, tables.
18      Q.   Any supervisory responsibilities?
19      A.   No.
20      Q.   Okay.  What was your next position with the Meriden
21   Board of Education?
22      A.   Went over to Thomas Edison.
23      Q.   What was your position at Thomas Edison?
24      A.   Custodian again.
25      Q.   Day or night?
```

25

1   A.   Yes.
2   Q.   Okay. As custodian at Thomas Edison, what were
3   your duties?
4   A.   Clean the kitchen, clean the cafeteria, put down
5   chairs, and then I had an assignment after that, take care of
6   the gym, clean bathrooms, the hallway.
7   Q.   The assignment varied?
8   A.   Excuse me?
9   Q.   The assignment, you said clean the gym or whatever,
10  would that vary day to day?
11  A.   No, no, no.
12  Q.   What was your next position with the Meriden Board
13  of Education?
14  A.   Ben Franklin Elementary.
15  Q.   And what was your position at Ben Franklin?
16  A.   Head custodian.
17  Q.   I forgot to ask you, how did you get the Thomas
18  Edison position, did you apply for it?
19  A.   Yes, I did.
20  Q.   Was that writing a letter to someone?
21  A.   Yeah, writing a letter to the personnel, maybe it
22  was David Roy, yeah, David Roy was there probably.
23  Q.   He was the personnel director?
24  A.   Yes.
25  Q.   Did you have to interview with anyone for that

41

1    A.    Correct.

2    Q.    You contacted that vendor for fuel oil?

3    A.    Correct.

4    Q.    What happened?

5    A.    Nothing. The next day, usually it comes the next day, no oil, the oil didn't come the next day. So I said I am going to give it one more day, and I waited another day. I called, finally got somebody, asked where the oil was, and the gentleman on the phone, they switched me over to a gentleman on the phone and he said that he hasn't been getting paid, he wants a purchase order number or he is not sending any oil.

So then I went and I called down the maintenance office because I told him, I told the guy on the phone, "I don't have that number, I have to call down to my supervisor's office and find out and get the number and call you back." So I did so, I called down there and I spoke to them, to John, and he told me to make up a purchase order number, and I didn't like that idea, so I waited and I called again and they told me just make up a purchase order number. Then I went to Mr. Villar and explained that to him, what was going on, and he said, "It sounds kind of shady to me, you might as well call John back and tell him you are not going to do it, he needs to give you a number." So I did and he got pissed off and swore at me and hung the phone up on me,

42

1  and then I called Glenn Lamontagne right after that phone
2  call and he told me to, "Calm down, Ed, relax. I'll take
3  care of it," and within the next day I got my oil after
4  contacting him.
5     Q.  What was John Cordani's title in October 1999?
6     A.  Manager of buildings and grounds.
7     Q.  Was he assigned to any particular school?
8     A.  No, he is assigned to them all.
9     Q.  Did he supervise all the head custodians?
10    A.  I guess. As far as "supervise," you mean like come
11 around and tell us what to do?
12    Q.  Well, did you consider him a supervisor?
13    A.  Yes, I did, especially if it was something like
14 that.
15    Q.  And what was Mr. Villar's title in October 1999?
16    A.  Assistant principal.
17    Q.  Was Glenn Lamontagne the assistant superintendent?
18    A.  Yes.
19    Q.  Do you remember what date in October of 1999 you
20 had your first conversation with John Cordani?
21    A.  No, I don't recall that, but it is on the piece of
22 paper.
23    Q.  Okay. Try and be as specific as you possibly can,
24 verbatim tell me about your conversation with the vendor
25 company for the oil. What did you tell the vendor company?

43

| | | |
|---|---|---|
| 1 | A. | "Where is my oil?" |
| 2 | Q. | When you first called him, what did you say? |
| 3 | A. | "I would like to order oil." |
| 4 | Q. | Okay. Did he tell you you needed anything at that time? |
| 6 | A. | No, nope. |
| 7 | Q. | You just said, "I want to order oil" and they said, "We will have it there tomorrow" or what? |
| 9 | A. | Yes. |
| 10 | Q. | And it didn't arrive, oil never came? |
| 11 | A. | Right. |
| 12 | Q. | So you called back a couple of days later? |
| 13 | A. | Correct. |
| 14 | Q. | That is when you spoke to someone and they said they wanted a purchase order number? |
| 16 | A. | They transferred me over to a guy, the woman who answered the phone. I don't know who the vendor was at that time, I don't know the name. |
| 19 | Q. | That was the next question, do you remember who the vendor was? |
| 21 | A. | No, I don't. |
| 22 | Q. | You were told you needed a purchase order number and you called John Cordani? |
| 24 | A. | Yes. |
| 25 | Q. | And you talked to him on the telephone? |

44

1  A.  Yes. Well, all the times were on the phone.
2  Q.  What did you specifically tell John?
3  A.  That --
4  MS. ENGSTROM: Asked and answered. He just told you
5  that before.
6  BY MS. VOCCIO:
7  Q.  You can answer.
8  A.  Say that again now?
9  Q.  I want you to tell me verbatim what you told John
10 in that first phone conversation?
11 A.  I am not going to remember exactly word for word.
12 I said I needed a purchase order number, they are not going
13 to send the oil without a purchase order number.
14 Q.  Verbatim what did he tell you?
15 A.  "Make a number up."
16 Q.  Did you ask him what he meant by that?
17 A.  Yes, he said use a birth date or something to that
18 effect and I'll fix it when it comes down to the office.
19 Q.  Okay. So you called John, asked for a purchase
20 order number, he tells you to make one up?
21 A.  Correct.
22 Q.  What did you specifically say to him in response?
23 A.  I said, "I don't know about that."
24 Q.  Okay. Is that all you said?
25 A.  That I can recall.

45

1    Q.    "I don't know about that." Did you ask him, you
2  told me just you a minute ago you asked him what he meant
3  about the purchase order?
4    A.    Yeah, and I wasn't going to do it.
5    Q.    You are not, I am trying to understand
6  specifically, because this is very important to your case and
7  I know to you it's probably you are thinking of the idea of
8  the conversation and what the, you know, what you took away
9  from it, but I need to know, go into detail who said what and
10 when. You called John and said, "I need a purchase order
11 number," he says, "Make one up."
12   A.    Correct.
13   Q.    You say what?
14        MS. ENGSTROM: Objection; asked and answered.
15 BY MS. VOCCIO:
16   Q.    You can still answer.
17   A.    He said, "Make one up."
18   Q.    Okay. What did you say in response?
19        MS. ENGSTROM: Objection; asked and answered.
20   A.    I said, "What do you mean?"
21   Q.    Okay. You said, "What do you mean?" What did he
22 say specifically?
23        MS. ENGSTROM: Objection; asked and answered. He
24 just testified to that. You are asking him to repeat it.
25 Are you asking him to repeat what he already told you?

...

46

```
 1              MS. VOCCIO: I am asking him to give a verbatim
 2   response.
 3              MS. ENGSTROM: He said, "Make up a number like your
 4   birth date," and that was the second time around. Now you are
 5   asking the third time.
 6              MS. VOCCIO: Objection noted.
 7              MS. ENGSTROM: I am going to instruct him not to
 8   answer the question.
 9              MS. VOCCIO: You are instructing him not to answer
10   the question?
11              MS. ENGSTROM: It's the same question you asked five
12   minutes ago, this is the third time around.
13              MS. VOCCIO: Let's call a judge.
14              MS. ENGSTROM: You are not going to ask him the
15   questions three times.
16              MS. VOCCIO: You know what the objections are.  The
17   objections are --
18              MS. ENGSTROM: It's duplicative, cumulative.
19              MS. VOCCIO: That is not a proper objection to
20   instruct the client not to answer.  Your objection is noted.
21   If you want to instruct him not to answer, which is my
22   understanding, we will stop the deposition and we will call
23   the judge. Is that what you are doing?
24              MS. ENGSTROM: Yes.
25              MS. VOCCIO: We will stop the deposition.
```

47

1              (Recess taken from 11:28 to 11:37 a.m.)
2    BY MS. VOCCIO:
3        Q.   Mr. Boganski, before we broke I was asking you
4    about your conversation, your first conversation with John
5    Cordani about the purchase order.
6        A.   Uh-huh, yes.
7        Q.   I am trying to get from you as specific as possible
8    what you recall that each person said in this conversation.
9    I believe before we broke I was asking you specifically what
10   Mr. Cordani said to you about the purchase order, and so I
11   want to make sure we are clear.  My understanding so far is
12   you called Mr. Cordani and asked him for a purchase order to
13   order oil, is that correct?
14       A.   Correct.
15       Q.   And he responded, "Make up a purchase order?"
16       A.   Correct.
17       Q.   And then you responded, "That doesn't sound right,"
18   or what did you say in response?  Because this is where we
19   broke right before we had to call the judge.  When he said to
20   make up a purchase order number, what specifically did you
21   say in response?
22            MS. ENGSTROM: Objection.
23       A.   I don't remember all of that.  Everything I told
24   you is what happened.
25       Q.   I am trying to make sure we have a clear record.  I

48

1  am asking you now what do you recall saying to Mr. Cordani?
2         MS. ENGSTROM: Other than what he already told you
3  that he said before ten minutes ago?
4         MS. VOCCIO: We are trying to clarify the record.
5         MS. ENGSTROM: He already gave you a verbatim quote.
6         MS. VOCCIO: You made me call the judge, you spoke
7  to the judge's clerk, who's already advised what proper
8  objections are and when it is proper to instruct your client
9  not to answer. You can object for the record, I understand.
10 BY MS. VOCCIO:
11     Q.   I am asking you because I am trying to get a
12 chronological order and your best recollection, it benefits
13 you and me both, what you said to Mr. Cordani when he told
14 you to make up a purchase order number?
15         MS. ENGSTROM: Objection to the form; asked and
16 answered.
17         MS. VOCCIO: Fine.
18 BY MS. VOCCIO:
19     Q.   You can answer. What did you say?
20     A.   You are losing me because you two are arguing, so.
21     Q.   Okay.
22     A.   You are, you guys are losing me.
23     Q.   That is fine. I'll repeat the question as many
24 times as I need to, or rephrase it if you need to.
25         Mr. Cordani tells you to make up a purchase order

49

1  number?
2       A.    Correct, correct.
3       Q.    What did you say to him in response?
4       A.    "I don't know about that."
5       Q.    Okay.  Did you say anything else, or just, "I don't
6  know about that."
7       A.    "What are you talking about?" And he just said,
8  "Make up a number, birthday, whatever.  I'll fix it, when it
9  comes down here, I'll fix it."
10      Q.    Okay.  You recall him specifically saying
11 "birthday?"
12      A.    Yeah.
13      Q.    Was anything else said in that conversation?
14      A.    I don't remember.
15      Q.    Did you tell him, "No, I am not going to do that?"
16      A.    On the first phone call?
17      Q.    Correct.
18      A.    I don't remember that either.
19      Q.    Did you say, "Mr. Cordani, that seems illegal to
20 me.  That is not right." Did you say anything like that?
21      A.    I don't remember that either.
22      Q.    What happened when you hung up the phone, what did
23 you do?
24      A.    What did I do?
25      Q.    I think you said before you didn't like the idea,

```
                                                          50
 1   so you called him again, is that right?
 2         A.    I went to -- I called him again.
 3         Q.    How much time passed between these two phone calls?
 4         A.    A day maybe.
 5         Q.    Oh, okay.  So you didn't --
 6         A.    No, because it was bothering me in my mind.  I
 7   don't know, man, it didn't sound right.
 8         Q.    Were you running low on fuel oil at that time?
 9         A.    Yes, I was.
10         Q.    You were not worried about running out before the
11   fuel oil came in?
12         A.    No -- yes, I was.
13         Q.    Okay.  Then why did you wait a day?
14         A.    Because I was struggling, I didn't want to do what
15   he asked.  That is why I waited, because if I was that
16   concerned I would have said, "Screw it," and go ahead and
17   order the oil, but it didn't sound right, so I am not going
18   to do something that is not right.
19         Q.    So you called him back?
20         A.    (Nodding head in the affirmative.)
21         Q.    Yes?
22         A.    Yes.
23         Q.    The next day?
24         A.    Uh-huh.
25         Q.    Yes?
```