1        MS. ENGSTROM: Objection to the form.

2    A.   He might have, I don't remember. I can't remember a

3 specific thing. I mean, five or six years ago this stuff was

4 there, now there is documentation.

5        MS. ENGSTROM: Can we take a break just for a second

6 before you ask another question? Let's go outside.

7        (Defendant's Exhibit 6: Marked for Identification -

8 retained by Counsel.)

9        (Recess from 2:04 to 2:07 p.m.)

10 BY MS. VOCCIO:

11   Q.   Mr. Boganski, you grieved your suspension, correct?

12   A.   Yes, I did.

13   Q.   And did that suspension go all the way to

14 arbitration?

15   A.   Yes, it did.

16   Q.   I am going to show you what I just marked as

17 Defendant's Exhibit 6 and ask you to identify that document.

18   A.   That is the arbitration.

19   Q.   That is the arbitration decision?

20   A.   Yes, yes.

21   Q.   Under the "Facts" section of this decision the

22 arbitrator writes quote, "Mr. Lamontagne, assistant

23 superintendent of finance and administration, testified that

24 he had spoken to Boganski for six to eight months regarding

25 Boganski seeing to it that other custodians receive the

1  Controlled Air computer training."
2       Do you deny that Mr. Lamontagne --
3    A.  I never said I denied it.
4    Q.  I am asking you the question, do you deny that Mr.
5  Lamontagne spoke to you for six to eight months regarding you
6  getting the other custodians trained?
7    A.  I don't remember. Like I said, I am not denying
8  anything.
9    Q.  It also says in this back section of the
10 arbitration decision, quote, "Mr. Cordani testified that he
11 had given a directive to Boganski to see to it that the
12 custodian training took place."
13      Do you deny that Mr. Cordani gave you such a
14 directive?
15   A.  I don't remember, and I am not denying it either.
16 What do you want those two guys to do, lie for each other?
17 Come on.
18   Q.  It also says in the Fact section, quote, "Dr.
19 Villar directed Boganski to get other custodians trained on
20 the computer."
21   A.  Okay.
22   Q.  Period end quote.
23   A.  Uh-huh.
24   Q.  Do you deny that Dr. Villar directed you to get
25 other custodians trained?

109

1  A.  Like I said, I am not denying anything.

2  Q.  And you eventually did get the other custodians
3  trained, but that was after your suspension, is that correct?

4  A.  I believe it was, it was either I tried before or
5  it was right after.

6  Q.  Why didn't you get the training sooner?

7  A.  Why didn't I get the training sooner?

8  Q.  (Nodding head in the affirmative.)

9  A.  To who, the other custodians?

10 Q.  Correct.

11 A.  I was told not to.

12 Q.  By who?

13 A.  By the company before Controlled Air took over, the
14 people that installed the new system.

15 Q.  Okay.  But did any of your supervisors tell you not
16 to get the other custodians trained?

17 A.  Not that I remember.

18 Q.  Okay.  And in fact you have no reason to dispute
19 that in fact your supervisors told you to get the other
20 custodians trained?

21      MS. ENGSTROM: Objection; vague.  I don't understand
22 that question.

23      MS. VOCCIO: Well, that is not up to you to
24 understand.

25 BY MS. VOCCIO:

110

1    Q.    It is up to you to understand it.
2          MS. ENGSTROM: It is incomprehensible. Objection;
3    incomprehensible.
4          MS. VOCCIO: Okay.
5    A.    Say it again?
6          MS. VOCCIO: I'll let her read it back.
7          (The record was read.)
8    A.    What were my answers over there?
9    Q.    Just answer the question.
10   A.    I can't answer it. I did answer the question on
11   those documents.
12   Q.    I am asking you now.
13   A.    And I --
14   Q.    You need to refresh your recollection?
15   A.    Sure, why not?
16   Q.    What do you need to refresh your recollection?
17   A.    I don't know. I don't feel how this is relevant to
18   my case anyways.
19   Q.    You still have to answer the question.
20   A.    I don't remember.
21   Q.    As you sit here today --
22   A.    Okay.
23   Q.    -- do you have any evidence, I am trying not to
24   make double negatives, to dispute the fact that three
25   supervisors actually directed you to get the other custodians

111

1   trained?
2       A.   To say that they didn't?
3       Q.   Correct.
4       A.   I don't have no evidence to that effect.
5       Q.   Okay. The other reason given for your suspension
6   you said, I believe, was the possession of the Sonitrol list?
7       A.   Correct.
8       Q.   What was that about? What is that issue about?
9       A.   They claimed that I had a Sonitrol list with
10  everybody's security numbers on it and my own.
11          MS. VOCCIO: Can you mark this?
12          (Defendant's Exhibit 7:  Marked for Identification
13  - retained by Counsel.)
14  BY MS. VOCCIO:
15      Q.   What is Sonitrol?
16      A.   It is a security system.
17      Q.   And what was the list that you are referring to?
18      A.   The list of codes.
19      Q.   Codes of who?
20      A.   People that can enter the building, including
21  myself.
22      Q.   Did employees know each other's codes or was that a
23  private matter?
24      A.   That I have no clue. I didn't personally know
25  anybody else's, I didn't need to. I can go in any time I

```
                                                            115
 1   referring to, the fact Villar never looked for it and didn't
 2   find it?
 3        A.    I looked for it for him and it was done in the
 4   office.  That is my evidence, yes, I brought him there.
 5        Q.    Your evidence?
 6        A.    That is my evidence, and if I was a liar, he should
 7   have taken it then and there.
 8        Q.    Did Mr. Villar ask you if you had the list?
 9        A.    Yes, he did.
10        Q.    Did you deny having the list?
11        A.    Yes, I did.
12        Q.    Had you ever seen the list?
13        A.    No, I haven't. I testified to that before too.  I
14   didn't see the list.
15        Q.    Okay.  Exhibit 7, the front page, looks like the
16   copy of an envelope?
17        A.    Correct.
18        Q.    And it says, "Washington Middle School, attention
19   Edward Boganski?"
20        A.    Correct.
21        Q.    But it is your testimony here today that you never
22   saw this list?
23        A.    No, I opened the piece, the envelope up, I saw some
24   names on it and stuff, I realized what it was and I turned it
25   over to the principal, Shellie Pierce.
```

116

1  Q. So you did see the list?
2  A. Not to, I didn't look at it per se all the whole
3  thing, I just saw the top name of it and I brought it back
4  and I gave it to the principal.
5  Q. When did you give it to Miss Pierce?
6  A. Immediately as soon as I received it.
7  Q. When did you receive it?
8  A. I don't remember, whatever is marked on there, the
9  mail, postage stamp.
10  Q. Can you tell from looking at this document when you
11  received it?
12  A. No, because I can't see the postage stamp.
13  Q. Was anyone present when you gave this list to Miss
14  Pierce?
15  MS. ENGSTROM: Other than Miss Pierce?
16  MS. VOCCIO: Obviously.
17  MS. ENGSTROM: I don't know, I was wondering.
18  A. Not that I am aware. I handed it to her. She
19  said, "What is this?" I said, "A Sonitrol list," and I
20  handed it to her and I walked away.
21  Q. Do you dispute the fact that this was actually
22  found in your office, and when I say "this" the list, Exhibit
23  7?
24  A. Do I dispute it?
25  Q. Correct.

117

1     A.   Yes, I do. I wasn't even present when they took it from me, when it supposedly was there, because I do dispute it. That is why I went to arbitration, it wasn't there. If it was there, take it in front of me.

    Q.   How do you think it got there?

    A.   How would I know? Ask Mr. Popato, he found it.

    Q.   What was your relationship like with Mr. Popato back in the fall of 1999?

    A.   Same as it always is, I don't trust him and I don't talk to him.

    Q.   Why don't you trust him?

    A.   Why? Well, he is all right now because Cordani hates him now, so he is all right now. He was Cordani's, he hung out with Cordani all the time and he would go back and squeal on everybody and that is the same year that he made $95,000 a year.

    Q.   Had you ever known --

    A.   And also, let me finish, there is a, there's love letters that him and his girlfriend, because he is married and he was cheating with a girl at Washington Middle School who was also married and I have the love letters to prove it and he knew about that and I had tapes and actually his wife and the woman had a fight up at the school, up at Washington Middle School about him.

    Q.   Were you blackmailing him?

```
 1    A.   No, for what?
 2    Q.   Then why did you have the love letters?
 3    A.   Because the girl gave them to me and I told them I
 4  didn't want them. I just left them in my drawer at the
 5  school.
 6    Q.   Why did you keep them?
 7    A.   Why not?
 8    Q.   Well, people can give me lots of things and I'm not
 9  going to hold on to it. Why did you hold on to it?
10    A.   I have no idea, I just put it in the draw.
11    Q.   Did you tell Mr. Popato that you had these letters?
12    A.   No, I think the girl told him, the girl he was
13  screwing around with, the girlfriend.
14    Q.   Do you know that --
15    A.   Do I know what?
16    Q.   Do you know that for a fact that she told him?
17    A.   I don't know that for a fact.
18    Q.   To your knowledge had Mr. Popato ever lied about
19  anything else?
20    A.   I have no idea. I can't respect somebody that is
21  cheating on his wife with three kids, would you?
22    Q.   Do you believe Mr. Popato planted the list in your
23  office?
24    A.   Do I believe that? I would say I would have to,
25  because how else did it get there?
```

```
                                                                  119
```

1    Q.  Do you have --

2    A.  No, I don't.  I have no evidence if that is what
3  you are going to ask me.

4    Q.  Do you know any reason why Mr. Popato would do
5  that, plant a list?

6    A.  I have no idea.  You would have to ask Mr. Popato
7  that, But the thing of it is nobody ever found the list in
8  front of me.  It's funny, though.  Come on, that is funny.

9    Q.  Were you represented at the arbitration?

10   A.  Yes, I was.

11   Q.  By whom?

12   A.  Somebody from the union.

13   Q.  Who?

14   A.  I don't remember her name.

15   Q.  Did you testify at the arbitration?

16   A.  Yes, I did.

17   Q.  Who else testified at the arbitration?

18   A.  Cathy McParland, I believe.  I don't know, there
19  was a bunch of people.  I don't remember back then.  That was
20  in 2000, that is when Cathy was going to get her head blown
21  off for helping me.  Do you remember you saw that letter?

22   Q.  I wanted to ask you about some people.  Did Mr.
23  Lamontagne testify?

24   A.  Uh-huh.

25   Q.  Did Mr. Popato testify?

129

1       (Recessed 2:35 to 2:40 p.m.)
2       (The record was read.)
3  BY MS. VOCCIO:
4       Q.   Do you know what the arbitrator ruled?
5       A.   In favor of the Board of Education.
6       Q.   Okay. I know I asked you this with respect to the
7  memos, but now I am asking it with respect to the suspension,
8  and it may be the same, that is fine. But what evidence if
9  any do you have that the suspension was in retaliation for
10 your complaining about John Cordani?
11      A.   The memos, all the memos, as far as him yelling at
12 me in the office, my office, with Villar present.
13      Q.   Meaning Cordani yelling at you?
14      A.   Cordani yelling at me, and he basically told me he
15 doesn't want to hear me complaining, that he is mad that I
16 was complaining about him, him coming back and forth to the
17 school with a videotape and papers under his arm, Villar
18 going to meet down in Cordani's office with his laptop.
19      Q.   Anything else?
20      A.   That is about it.
21      Q.   Okay. Do you know who made the decision to suspend
22 you?
23      A.   I have no idea.
24      Q.   Does John Cordani have the authority to suspend
25 you, if you know?

1  for him either way. I don't have feelings either way towards
2  the gentleman.
3      Q.  At one point do you think he was?
4      A.  Yes, because he put me through all that
5  aggravation, and you would also, but over time you learn to
6  forgive, but you never forget.
7      Q.  What's your current relationship like with Mr.
8  Lamontagne?
9      A.  I don't talk to him and he doesn't talk to me, so
10 there is no relationship.
11     Q.  What is your relationship with Mr. Villar?
12     A.  He is a big shot now, he is assistant
13 superintendent now, associate superintendent. If he sees me
14 in passing he says "Hi" and that is about it.
15     Q.  How do you feel about him?
16     A.  Nothing, the same, I don't feel anything.
17     Q.  Okay. You have identified again several people that
18 you believe that have retaliated against you. Who do you
19 believe is responsible for the suspension?
20     A.  Cordani.
21     Q.  Anyone else?
22     A.  That is about the only person I can think of.
23     Q.  Okay. Last but not least, interrogatory number 24,
24 again, the last act that you have identified as being
25 retaliatory is a demotion of October 1999?

1   A.   October 1999?

2   Q.   (Indicating.) That is what it says there.  Is that
3   correct?

4        MS. ENGSTROM: That may be incorrect.

5   A.   Yeah, I think they missed up on that, because it
6   was February of 2000.

7   Q.   Okay.

8   A.   That is probably, well, they must have.  I know for
9   a fact that I got demoted in 2000, February of 2000.

10  Q.   Okay.  So that is the third act of retaliation that
11  you believe was carried out against you was this demotion in
12  February of 2000?

13  A.   Correct.

14  Q.   You were never demoted in October of 1999?

15  A.   No.

16  Q.   And the demotion is when you were transferred to
17  the night custodian position?

18  A.   Correct.

19  Q.   And you signed a letter of agreement to accept that
20  transfer, correct?

21  A.   Through the superintendent's office and that, there
22  is, there was two different letters because remember how I
23  explained to you the Board of Ed. when you want to move
24  somewhere you go through the personnel department?

25  Q.   Mark this document.

135

1  A.  That letter went through.

2  Q.  That is all. I am going to have her mark it and
3  you can't talk at the same time.

4  A.  There is another one in there too.

5     (Defendant's Exhibit 8: Marked for Identification -
6  retained by Counsel.)

7  BY MS. VOCCIO:

8  Q.  We have just marked Defendant's Exhibit 8, which
9  is a letter of agreement.

10 A.  Uh-huh.

11 Q.  (Handing.)

12 A.  Yes, I signed it.

13 Q.  Okay. That is a letter of agreement signed by you
14 accepting the transfer to the night custodian position, is
15 that correct?

16 A.  I just went through Beth Rocco, the superintendent
17 of schools, because it was two separate letters, because
18 there was another letter that was the fourth amendment there.
19 I have the letter.

20 Q.  My question is I have just properly identified this
21 document. What is that document?

22 A.  I signed it to be transferred in fear for being
23 fired.

24 Q.  You signed this letter of agreement, agreeing to be
25 transferred?

136

1     A.   In fear of being fired, in fear of being suspended.

2     Q.   My question is just did you sign it? Try and
3 listen to the question.

4     A.   Yes, I am listening to you. I am trying to listen.

5     Q.   Did you sign it?

6     A.   Yes, I did sign it in fear of being -- you don't
7 want to hear the truth?

8     Q.   You don't get to ask the questions.

9     A.   Relax, relax. You have got to relax.

10     Q.   So do you.

11     A.   Believe me, I am fine.

12     Q.   And this letter of agreement signed as Defendant's
13 Exhibit 8 is also signed by your union representative,
14 correct?

15     A.   Yes.

16     Q.   Which was Cathy McParland?

17     A.   Correct.

18     Q.   And it is also signed by David Roy, the personnel
19 director?

20     A.   Correct.

21     MS. ENGSTROM: Can I take a look at that, please?

22     MS. VOCCIO: Oh, sure.

23     A.   There was two of those, Beth didn't like the other
24 one.

25 BY MS. VOCCIO:

149

## CERTIFICATE

1  
2  STATE OF CONNECTICUT :  
3                                    SS  
4  COUNTY OF TOLLAND    :  
5          I, Deborah L. Mills, a licensed court reporter  
6  within and for the State of Connecticut, do hereby certify  
7  that the deposition of EDWARD J. BOGANSKI, JR., was taken  
8  before me pursuant to Notice and the Connecticut Practice  
9  Book, at the offices of Howd & Ludorf, 65 Wethersfield  
10 Avenue, Hartford, Connecticut, commencing at 10:09 a.m. on  
11 February 10, 2005.  
12         I further certify that the witness was first sworn by me  
13 to tell the truth, the whole truth, and nothing but the  
14 truth, and was examined by counsel, and his testimony  
15 stenographically reported by me and subsequently transcribed  
16 as hereinbefore appears.  
17         I further certify that I am not related to the parties  
18 hereto or their counsel, and that I am not in any way  
19 interested in the event of said cause.  
20         Dated at Tolland, Connecticut, this 12th day of March,  
21 2005.  
22         _____  
23         Deborah L. Mills, Notary Public  
24 My Commission Expires:  
25 June 30, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EDWARD BOGANSKI             :        NO. 3:01CV2183 (AVC)

vs.                         :

CITY OF MERIDEN BOARD OF
EDUCATION and JOHN CORDANI  :        FEBRUARY 22, 2005


CONTINUED DEPOSITION OF:  EDWARD BOGANSKI
        VOLUME II    -    PAGES 140-308


APPEARANCES:

    WILLIAMS & PATTIS
        Attorneys for the Plaintiff
        51 Elm Street
        New Haven, CT 06510
        (203) 562-9931
    BY: KATRINA ENGSTROM, ESQ.


    HOWD & LUDORF
        Attorneys for the Defendants
        65 Wethersfield Avenue
        Hartford, CT 06114
        (860) 249-1361
    BY: ALEXANDRIA L. VOCCIO, ESQ.


Christine E. Borrelli
Connecticut License No. 117
Registered Merit Reporter

NIZIANKIEWICZ & MILLER REPORTING SERVICES

```
 1        A.    Okay.
 2        Q.    Let me ask you if you have ever seen that document
 3   before?
 4        A.    No.
 5        Q.    Okay.  Do you recognize the signature toward the
 6   bottom of the page?
 7        A.    Yes.
 8        Q.    Who is that?
 9        A.    John Cordani.
10        Q.    And does that appear to be a purchase order for fuel
11   oil?
12        A.    Yes.
13              MS. ENGSTROM:  Can I look at that, please?
14        Thanks.
15        Q.    (By Ms. Voccio)  When Mr. Cordani asked you to make
16   up a purchase order number --
17        A.    Uh-huh.
18        Q.    -- did you believe that it was his intention to
19   obtain fuel without the Board of Education paying for it?
20        A.    I have no idea.
21        Q.    Why did you think it was an improper request?
22        A.    Because it doesn't sound right to make up.  It's
23   like making up -- I don't know, just making something up.  I
24   don't agree with that.  Why would you do that?
25        Q.    Well, would there be something wrong in your mind
```

1  Q.  -- aside from Mr. Villar and Mr. LaMontagne, did you
2  ever complain to anyone else about Mr. Cordani telling you to
3  make up a purchase order number?
4  A.  You mean besides Villar and Mr. LaMontagne?
5  Q.  And Mr. LaMontagne, yes.
6  A.  I believe Rick Allen.
7  Q.  And what was Mr. Allen's position at that time?
8  A.  He was union president at that time.
9  Q.  Okay.  Did you ever go outside the Meriden Board of
10 Ed to complain to the police or anything like that?
11 A.  No.  But now that you say that, I do remember
12 talking to my cousin who holds the same position as Glen
13 LaMontagne in Wethersfield and I asked him about that and he
14 said that's not cool to do that.
15 Q.  What is not cool to do?
16 A.  Make up a purchase order number.
17 Q.  Okay.  Did you ever consider going to the police?
18 A.  No.
19 Q.  Why not?
20 A.  I wasn't thinking of it at the time to go to the
21 police.
22 Q.  Did you ever consider going to the press to say,
23 hey, this is what is going on in the Meriden Board of Ed?
24 A.  No.  That didn't even cross my mind either.
25 Q.  Did you consider going to the mayor at that time?

```
 1                    C E R T I F I C A T E
 2
 3         I, Christine E. Borrelli, a Notary Public and
 4   Licensed Court Reporter for the State of Connecticut, do
 5   hereby certify that the continued deposition of EDWARD
 6   BOGANSKI, was taken before me pursuant to the Federal Rules of
 7   Civil Procedure, at the law offices of Howd & Ludorf, 65
 8   Wethersfield Avenue, Hartford, Connecticut, commencing at
 9   10:20 a.m. on Tuesday, February 22, 2005.
10         I futher certify that the witness was first sworn by
11   me to tell the truth, the whole truth, and nothing but the
12   truth, and was examined by counsel, and his testimony was
13   stenographically reported by me and subsequently transcribed
14   as herein before appears.
15         I further certify that I am not related to the
16   parties hereto or their counsel, and that I am not in any way
17   interested in the events of said cause.
18         Witness my hand this 15th day of March, 2005.
19
20
21
22
23                                    Christine E. Borrelli
                                      Notary Public
24                                    CT License No. 117
     My Commission Expires:
25   June 30, 2006
```