# American Arbitration Association

*[handwritten annotations: "Pending Legality Boganski, Ed"]*

_____ ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

MERIDEN FEDERATION OF MUNICIPAL EMPLOYEES

AND

MERIDEN BOARD OF EDUCATION

CASE NUMBER:   12 390 00169 00

## AWARD OF ARBITRATOR(S)

I (WE), THE UNDERSIGNED ARBITRATOR(S), having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated July 1, 1998 and having been duly sworn and having duly heard the proofs and allegations of the parties, AWARD as follows:

### AWARD

The Meriden Board of Education did not violate Section 9.1 of the Collective Bargaining Agreement between the parties when it suspended the Grievant, Edward Boganski, for three days in December, 1999.

8-2-01
(Date)

(Signature of Arbitrator)
M. Jackson Webber

STATE OF   Connecticut

} SS:   Hartford

COUNTY OF   Hartford

On this 2nd day of August, 2001, before me personally came and appeared M. Jackson Webber, to me known and known to me to be the individual(s) described in and who executed the foregoing instrument, and he acknowledged to me that he executed the same.

_____ Connie R. Shea, Notary Public
My Commission Expires 3-31-03

0000146

Form G3-9/92

AMERICAN ARBITRATION ASSOCIATION
EAST HARTFORD, CONNECTICUT

| | |
|---|---|
| MERIDEN FEDERATION OF MUNICIPAL EMPLOYEES | : |
| and | : August 2, 2001 |
| MERIDEN BOARD OF EDUCATION | : |
| Edward Boganski Suspension | : |

Claim No. 12 390 00169 00

Representatives of the parties:

Representing the Grievant:     Pat Fitton, CFEPE Representative

Representing the Board:        Robert J. Murphy, Esquire

### ISSUE

1. Did the Board violate Section 9.1 of the collective bargaining agreement between the Meriden Board of Education and the Meriden Federation of Municipal Employees, in effect from July 1, 1998 to June 30, 2001, when it suspended Mr. Edward Boganski for three days in December, 1999?

2. If so, what shall the remedy be?

M. Jackson Webber, Arbitrator
661 Wethersfield Avenue
Hartford, CT 06114

0000147

FACTS

In December of 1999, the Grievant, Ed Boganski, was the head custodian at Washington Middle School. Prior to July, 1999, Principal Shellie Pierce directly supervised the Grievant. However, at that time, Dr. Jeffrey Villar became the Assistant Principal at the school and was assigned, among other duties, the supervision of Mr. Boganski. (Board Brief, Page 4). Initially, Dr. Villar complimented Mr. Boganski. (Federation Exhibit #4 dated 7/1/99). However, beginning in August and September of 1999, Dr. Villar began to document problems with Mr. Boganski. (Interoffice Memorandum dated 9/14/99).

The Washington Middle School is monitored by a Sonitrol Alarm System. In order to enter a locked school building such as this one, an employee must enter his personal access code number on a key pad adjacent to the entrance to the building. (Board Brief, Page 5). Only certain employees, such as cental office administrators, are given access codes of other employees. To protect the security of the school, most employees do not have the right to know the codes of other employees. After all, knowledge of another's code would allow one to surreptitiously enter the school under an "assumed" identity. The integrity of the security system is vital for the safety and security of the

1

school itself. (Board Brief, Page 6).

In December of 1998, Mr. Boganski called Sonitrol and asked that Assistant Principal, Al Jaras, be moved down the call list. Mr. Boganski testified that he then received the list of employees' codes from Sonitrol. He further testified that he did not ask for or order the list and that when he received it, he immediately gave it to Principal Shellie Pierce. (Union Brief, Page 11). The envelope containing the employee list was addressed to the Grievant and marked "personal and confidential". (Board Brief, Exhibit #1).

A maintenance plumber/mechanic, Steve Papotto, while looking through a pile of work orders on Grievant Boganski's desk and found, mixed therein, a Sonitrol list of employees' codes marked "personal and confidential". Initially, he showed the list to another employee but, he testified, that two weeks later, he reported his find to the Union President, Rick Allen. (Union Brief, Page 4).

Sometime in November, Papotto was again working at the Washington Middle School and again found the Sonitrol list of employees' codes. He brought his discovery to the Manager of Buildings and Grounds, John Cordani. Cordani asked Papotto to make him a copy of the list and leave the original on Boganski's desk. Papotto testified that he did so. (Union Brief, Pages 4-6).

2

0000149

Cordani wrote a memorandum to Jeff Villar informing him of Boganski's possession of the Sonitrol employee's code list. (Federation Exhibit #3). Dr. Villar stated that on November 9, 1999, he questioned Boganski about his possession of the access codes and Boganski denied that he had them. Boganski brought Dr. Villar to his office and, although Boganski offered to allow Dr. Villar to search his office, Dr. Villar declined to search. (Union Brief, Page 7). Eventually, Mr. Cordani and Dr. Villar did collect the Sonitrol list of access codes from Boganski's office. (Union Brief, Page 7).

In 1998, Washington Middle School underwent remodeling and renovation work. As part of that work, a computerized system of controlling and monitoring heating, ventilation, and air conditioning was installed, manufactured by <u>Controlled Air</u>. To adjust this system, a custodian would have to be trained on the Controlled Air computer. As head custodian, Boganski was trained by Controlled Air technicians. (Board Brief, Page 8). This meant that, from the summer of 1998, to December of 1999, Boganski was the only custodian who could operate that computer. Therefore, all call-ins or overtime involving the Controlled Air system had to be taken by Boganski. (Board Brief, Page 8). Mr. Lamontagne, Assistant Superintendent of Finance and Administration, testified that he had spoken to Boganski for six

to eight months regarding Boganski seeing to it that other custodians received the Controlled Air computer training. Boganski was concerned about too many people adjusting the computer which had only one access code. Although Lamontagne disagreed with Boganski, he testified that he never gave a direct order to Boganski to have other custodians trained. (Union Brief, Page 8).

Mr. Cordani testified that he had given a directive to Boganski to see to it that the custodian training took place. (Union Brief, Page 5).

Mr. Boganski did train Jeffrey Villar on the Controlled Air system in September, 1999. Dr. Villar directed Boganski, in spite of Boganski's misgivings, to get other custodians trained on the computer. He further directed Boganski to set up a meeting with the Controlled Air technicians to investigate getting separate access codes for each custodian trained. A meeting was held with Boganski, Villar, and a Controlled Air technician. The technician gave a business card to Villar and said he would get back to them about the code issue. (Union Brief, Page 6).

Dr. Villar testified that he repeatedly asked Boganski to contact the technician about the access codes and computer training for other custodians.

0000151

Dr. Villar issued an interoffice memorandum to Boganski directing him to verify the date of the Controlled Air trainin[g] session. (Board Exhibit #4). In addition, during August and September, Dr. Villar began having problems with Boganski's overall performance as head custodian. (Board Brief, Page 5).

On December 9, 1999, a meeting was held to discuss percei[ved] deficiencies in Boganski's work performance. Attendant at tha[t] meeting were Principal Shellie Pierce, Dr. Villar, John Cordan[i,] Mr. Boganski, and Kathy McParland, also a head custodian and union officer for several years. (Board Brief, Page 9 and Unio[n] Brief, Page 12).

At that meeting, McParland asked if she should take notes. Principal Pierce told her that the administrators would provide her with notes of the meeting. (Union Brief, Page 13). At the December 9, 1999, meeting, Boganski denied having the Sonitrol Security access codes but admitted that he had not arranged the Controlled Air training for the other custodians. Boganski was again directed to do so. On December 15, 1999, Mr. Cordani contacted Controlled Air and ascertained that Boganski had still not arranged the training, even though he was at work on Decembe[r] 9, 10, 14, and 15, 1999. (Board Brief, Page 9). McParland stated that she and Boganski had not responded to the many issue[s] raised at the December 9, 1999, meeting because they wanted to

5

review the summary of the meeting that Pierce has promised her. (Union Brief, Page 13).

On December 17, 1999, a memorandum was given to Ed Boganski summarizing the December 9th meeting and setting out several complaints that the administration had with him, including being untruthful about his possession of the Sonitrol access codes and his failure to arrange training of the other custodians on the Controlled Air computer. (Board Exh. #5).

On December 23, 1999, another meeting was held to discuss the administration's complaints regarding Boganski. Much to McParland's surprise, Boganski state that he had not arranged the Controlled Air training sessions. (Board Brief, Page 9). McParland asked for more time to answer the administration's concerns because Boganski had been out of work for several days since the meeting of December 9, 1999, and that she had been unable to thoroughly prepare or investigate the issues. (Union Brief, Page 13).

On December 23, 1999, Boganski was suspended for three (3) days, December 28, 29 and 30, 1999. The suspension was without pay. (Union Brief, Page 1). The Grievant, Edward Boganski, filed a grievance on January 5, 2000, with Shellie Pierce, the Principal of Washington Middle School. (Jt. Exhibit 1, Page 1).

0000153

The basis for the grievance was that the suspension violated Section 9.1 of the Labor Agreement as it was without just cause.

## ARTICLE IX

## DISCIPLINE AND DISCHARGE

"9.1 <u>Discipline</u>

Employees shall not be suspended without pay or discharged except for just cause. All discipline shall be progressive in nature and shall not be inconsistent with the offense. All discipline shall occur in the following order.

1. Oral warning;
2. Written reprimand;
3. Suspension without pay;
4. Termination.

Discipline for serious offenses maybe initiated at the third or fourth level, depending on the severity of the offense."

(Joint Exhibit II, Article IX, Page 15).

The Grievance was processed as per the Collective Bargaining Agreement. After the Board of Education denied the grievance, the Union filed a claim for arbitration with the American Arbitration Association. On various dates, this matter was arbitrated before me, the undersigned arbitrator. (Board Brief, Page 2). The Board has asked that this grievance be denied. The

8

0000155

Union has asked that the suspension without pay be found to be a violation of Section 9.1 of the Collective Bargaining Agreement. (Board Brief, Page 2 and Union Brief, Page 40).

0000156

## UNION ARGUMENT

The Union pointed to Article IX of the labor agreement which mandates progressive discipline from an oral warning step by step through termination. (Joint Exhibit #2, Article IX). The Union contended that Article IX was violated because the Board failed to grant the Grievant the progressive discipline steps. (Union Brief, Page 16). With regard to the charge that Boganski failed "to follow a directive of the School Administration" by not getting other custodians trained on the Controlled Air equipment although several administration officials testified that they had requested him to do so, the Union argued that Article 9.1 of the Labor Agreement requires the administration to react the very first time a directive is ignored. (Union Brief, Page 18). The fact that M. Lamontagne, Assistant Superintendent of Finance and Administration, asked him to do so; the fact that John Cordani, Manager of Buildings and Grounds requested him to do so over a seventeen month period; the fact that Dr. Villar, the Assistant Principal of the school told Boganski to set up the training for the other custodians on three or four occasions in September and October, 1999, and finally issued a written directive on December 8, 1999, all show that the Administration never responded even

10

0000157

with an oral warning in approximately seventeen (17) months. The Union feels that since the Administration did not initiate the first step of the progressive disciplinary formula set out in Article 9.1, it cannot move on to the more severe suspension without pay. (Union Brief, Page 18). Further, the Union asserted that "repetitive directives do not constitute oral warnings". (Union Brief, Page 19). The Union avers that a proper oral warning requires notice of wrongdoing and notice that discipline is being imposed. Cordani, Villar, Lamontagne and Ms. Pierce never gave such notice. (Union Brief, Pages 18-19).

Further, the Union argued that even if a directive can be considered an "oral warning", it must move to the next step of progressive discipline, i.e. a written warning <u>before</u> advancing to the severe disciplinary action of suspending the Grievant for three (3) days without pay. (Union Brief, Page 19).

The Union asserted that Boganski was never given the chance to respond or react to early steps under the progressive discipline set out in Article 9.1 because they were never given. The Union avers, therefore, that the only message that the Administration did give to the Grievant was that the directives to get the other custodians trained should not be given weight or taken seriously. (Union Brief, Page 19).

"Second, the imposition of discipline must be prompt.

11

0000158

Arbitrators expect discipline to be corrective. If an employee is denied prompt notification of wrongdoing, he or she is denied the opportunity to correct that misbehavior and may be improperly penalized for repetitions, although deprived of notice that the original conduct was unacceptable and subject to punishment."
(Bornstein and Gosline, <u>Labor and Employment Arbitration</u>, Page 19-12).

The Union contended that for seventeen months, the Administration never notified Boganski of his wrongdoing; thereby effectively denying him the opportunity to correct his misbehavior. Therefore, the eventual three-day suspension was an improper penalty because the repetitive wrongdoing could have been averted by prompt notice and prompt discipline. (Union Brief, Page 20).

The Union also put forth the argument that Ed Boganski was concerned that, if many custodians had access to the computer access codes for Controlled Air, it would be impossible to know who made changes to the system. Consequently, Boganski would be held ultimately responsible for any problems as he was the head custodian. (Union Brief, Page 21). Therefore, when a meeting was set up by Boganski with the Controlled Air technician for September 27, 1999, Boganski <u>believed</u> that Dr. Villar agreed that

0000159

many custodians having access to the one computer access code was not desirable and that the technician said he would get back to Dr. Villar on the issue of access codes for each custodian. His failure to order the training can be explained at that point as his belief that they were waiting for the Controlled Air representative to contact Dr. Villar about the access codes. (Union Brief, Page 22).

In addition to the fact that no written directive to set up training came until the December 8th memorandum from Villar, is that the June, 1999, employee evaluation of Boganski never mentioned Boganski ignoring any directive. Mr. Cordani who testified that he told Boganski to set up the training, was part of the evaluating team. Yet, no mention of Boganski ignoring any directive. In fact, that evaluation was positive. (Union Brief, Page 24).

The Union pointed to the many memos issued to Boganski directing him to do certain things. None of them contained a directive or order to set up the training until the December 8th memorandum. Therefore, the Union asserted strongly, that there was no "documentary" evidence of directives to Boganski to set up the training until the December 8th memorandum issued the day before the disciplinary meeting. (Union Brief, Page 25).

"Making a false statement to his superiors" is the second

0000160

reason given by the administration for ordering a three-day suspension against the Grievant.

The Union acknowledges that the heart of the issue is whether Boganski knew that the Sonitrol letter containing the employee code numbers were on his desk. The Union agrees that there is evidence that both sides told the truth on this issue "as they knew it". (Union Brief, Page 28). It is admitted that Boganski stated several times that he did not have the document, but his actions evidence that he <u>believed</u> that he did not have the codes. (Union Brief, Page 28).

The Union pointed out that after Steve Papotto mentioned to Rich Allen, the Union President, about his seeing the codes on Boganski's desk. Mr. Allen talked to Boganski about it. At that point, the administration had no knowledge of the issue. Yet, Boganski made no attempt to look for, remove or destroy the letter. The Union averred that Boganski's actions "are those of an innocent man". If it were otherwise, he would have destroyed the damming evidence prior to the administration becoming involved. (Union Brief, Page 28).

When Dr. Villar asked Boganski about his possession of the codes, Boganski not only denied having them but took Villar to his office and asked him to search his desk and papers. Although Dr. Villar declined to do so, Boganski had made the offer for him

14