to look for the codes. When Villar declined, Boganski showed Villar papers and files and opened file drawers for inspection. In other words, once again Boganski acted innocently. His actions seem to prove that he did not believe that he had the codes. (Union Brief, Page 30).

The Union also pointed out that Cordani testified that he had told Villar where the letter with the codes could be found on the desk, yet Villar refused to look were he was told the codes could be found. The Union argued that this was strange behavior on the part of Villar unless he did not want to find it. That way, the administration could continue "to accuse him of having the list and lying about it." (Union Brief, Page 31). The Union strongly averred that the administration's <u>active failure</u> to retrieve the Sonitrol list while continuing to harass Boganski about it is a clear example of "...the administration's animus toward Mr. Boganski." (Union Brief, Page 32). In other words, they were more interested in finding Boganski guilty of wrongdoing than they were about retrieving the codes and protecting security at the school.

Although Boganski denied asking for the Sonitrol list from Sonitrol, his testimony that Ms. Pierce asked him to move Assistant Principal Jaras further down the "call list" and that he has called a man named "Oscar" at Sonitrol to do so, is

0000162

consistent with Pierce's testimony that she did ask him from time to time to modify the call list. Boganski testified that when the list came to him, he turned it over to Ms. Pierce. Tom Bruen, President of the Meriden Federation of Teachers who attended the grievance hearing for Ed Boganski, testified that he never heard Pierce deny Boganski's claim that he had given the Sonitrol list to her. (Union Brief, Page 14).

The Union plainly contended that the Administration disliked Boganski and wanted him out. In its zeal to force him out of his job, it violated due process. Firstly, the Union asserted, that when Kathy McParland asked if she should take notes at the December 9th meeting, Shellie Pierce said that Boganski and the Union would be furnished notes of the meeting. The written notes were not furnished until December 17, 1999. Ms. Pierce testified that McParland and Boganski asked for time to respond to the issues raised in the note. (Board Exhibit 5). No time limit on responses to the Association was given. (Union Brief, Page 33).

Although "It was unreasonable to expect the Grievant and the Union to answer" without a written summary, it is obvious that the Administration expected a response prior to providing the notes of the meeting. This, the Union contended, is "unreasonable". (Union Brief, Pages 33-34). This is evidenced by the fact that the Administration's summary of the December 9th

16

0000163

meeting states that both McParland and Boganski asked for "some time to discuss the issues brought forward at the meeting. We complied with you request, and to date have not heard back from you." The letter then demanded an immediate response. (Board Exhibit 5). In other words, the Administration did not expect to give the letter of summary note to Boganski prior to his answers to the issues raised at the meeting. This was potently unfair and an attempt to thwart due process in this case. The Union further pointed out that Boganski did not receive the notes summary of the December 9th meeting until December 21, 1999, two days before the next meeting. It is clear that due process was not granted. The Grievant had no time to prepare a response based on the notes that Ms. Pierce herself said would be furnished to the Grievant. (Union Brief, Pages 35-36).

The Union next asserted that Ms. Pierce and Mr. Villar decided to suspend the Grievant without pay for three days between December 17 and December 23, 1999. Lamontagne and Cordani were part of that decision process. The Union pointed out that the timing of the decision clearly evidences a lack of due process because the Administration "missed the crucial step of letting the Grievant and his Union investigate and answer the numerous charges against him." The Union contended this abridged the administrative requirement of due process. (Union Brief,

17

0000164

Page 36).

The Union strongly argued that the Administration was out to get Boganski removed from his position because the Administration liked Cordani and Villar didn't like him. The Union cited a statement of Cordani such as Boganski "would keep getting written up until he gets fired." In fact, even when Boganski accepted a transfer to Hooker School, Cordani complained to the Head Custodian of that school about Boganski causing the principal of Hooker School to be upset with Cordani. (Union Brief, Page 38). The Union also stressed the tremendous number of memoranda from Villar to Boganski as evidence of harassment Boganski, even while the Grievant was on vacation. The Union believes that this flurry of activity was simply to get the Grievant removed or fired. (Union Brief, Page 39).

Lastly, the Union contended that Article IX, Section 9.1 was violated by the Administration in that Boganski was not afforded progressive discipline nor was there just cause for his suspension. The Union pointed to Boganski's seven years' work record in his personnel file. That file contains ten performance evaluations, none of which marked anything as "improvement needed". In fact, there were four letters of commendation for jobs well done. (Board Exhibit 8, a-i). Further, the file does not contain any evidence of Boganski ever having been disciplined

before this suspension. Therefore, the Union contended that there was no just cause and no progressive discipline. The Union asked that Boganski's grievance be sustained.

BOARD ARGUMENT

The Board contended that the Administration has the right to suspend or terminate an employee without pay in a case of serious employee misconduct: "Discipline for serious offenses may be initiated at the third or fourth level, depending on the severity of the offense." (Article IX, Discipline and Discharge, Section 9.1 Discipline, Joint Exhibit II). The Board argued that the insubordinate ignoring of Administrative directives and untruthfulness to superiors were the security of the school building is at stake are "serious offenses" within the meaning of Article IX warranting suspension. (Board Brief, Pages 10-11).

The Board cites *Huntington Chair Corp.*, 24 L.A. 490, 491 (1955) (emphasis added) which states, in part: "Those extremely serious offenses such as ... persistent refusal to obey a legitimate order...usually justify summary discharge without the necessity of prior warnings or attempts at corrective discipline."

Ignoring directives to have custodians trained on the Controlled Air System was "serious". The job description of Head Custodian was to set up training programs to insure that the custodians were familiar with the mechanical functions of the

20

0000167

building. (Board Exhibit 2). To have only Boganski knowledgeable about the HVAC computer controls was "risky" especially in winter if Boganski was unavailable for any reason. (Board Brief, Page 12).

As to the Grievant's possession of the Sonitrol Security Codes for employees, the Board asserted that building security is materially essential to the safety of the school, its children and staff. The Administration was zealous about the confidentiality of the Sonitrol access codes. The Board averred that misrepresentations by Boganski regarding his possession of those codes calls into question his integrity and reliability and the integrity of the school security system. (Board Brief, Page 13).

Boganski was working in a supervisory capacity. The Board contended that it has a right to hold him to a higher level of performance than custodians working under him without first implementing progressive discipline. (Board Brief, Page 14).

As to the directives to arrange Controlled Air training for the other custodians, both Cordani and Villar testified that they verbally ordered Boganski to do that several times. On December 8, he put it in writing and at the first meeting with Boganski and the Union on December 9th, Boganski was ordered to set it up. By the next meeting, December 23rd, Boganski had still not

21

complied with the order. The Board assessed this lack of response as overt insubordination. (Board Brief, Pages 14-15).

Boganski met with Assistant Superintendent Lamontagne to discuss Boganski's reluctance about training custodians. Obviously, Cordani had previously directed Boganski to arrange the training; otherwise, there would have been no reason for the Assistant Superintendent to discuss it with Boganski. Villar began requesting the training in September of 1999. (Board Brief, Pages 15-16).

The Board questioned the Grievant's argument that Cordani and Villar assumed responsibility for setting up the Controlled Air training for the custodians. The Board pointed out that the Grievant never alleged in his written statement wherein he contested the allegations against him; did he assert that he had been relieved of the duty to arrange the training; or that Cordani or Villar had assumed that duty. (Board Brief, Page 16).

The Board pointed to eight excuses put forth by Boganski; everything from his being concerned about other custodians using his code to his being harassed as part of a conspiracy to having him removed. The Board asserted that the cumulative effect of these many excuses is to underscore the fact that Boganski was wilfully and repeatedly thwarting the direct orders of the Administration. (Board Brief, Pages 16-17).

0000169

As to the Grievant having the Sonitrol list of employees' codes in his possession, the Board argued that the fact that the envelope with Boganski's name, address and post office date stamp was also found in his office is "compelling evidence" that Mr. Boganski requested this material from Sonitrol and retained possession of it. (Board Brief, Page 18). Boganski claimed that he gave the list to Principal Pierce. However, the fact that the list was found on Boganski's desk is evidence that the list was not given to Ms. Pierce. To accept that Boganski had given it to Ms. Pierce would indicate that Boganski wanted the Arbitrator to believe that Ms. Pierce, or someone associated with her, planted the list back in Boganski's room "to embarrass and to punish him." The Board pointed out that there is no shred of evidence to substantiate that supposition. (Board Brief, Page 18).

Further, the Board averred, the testimony of Boganski conflicts with his written statement. In his testimony, he claimed that he opened the Sonitrol envelope, realized that it contained confidential information, and immediately gave it to Ms. Pierce. However, in his memorandum to Villar dated December 15, 1999, the Grievant said that he "never saw the letter in question." The Board believes that this inconsistency is strong evidence that he obtained and kept the list and was untruthful about those facts. (Board Brief, Page 19).

0000170

As to the Grievant's defense that he was being harassed by the Administration, the Board pointed out that Cordani and Pierce recommended Boganski for the position of head custodian. Secondly, if the Administration wanted him out, taking actions to simply suspend him for three days would not accomplish that objective.

Boganski claimed that Cordani's animosity toward him was evidenced at a meeting with Boganski and Rick Allen, the then Union President. Boganski claimed that Cordani used vulgar language with him. However, Allen testified that Cordani was "cordial but frank". (Board Brief, Page 20).

As to Villar's memoranda to Boganski, the Board asserted that they are evidence of Boganski's poor performance, not evidence of harassment. (Board Brief, Page 21).

The Board asked that the Grievance be denied and that the three-day suspension without pay be upheld.

0000171

## AWARD

The Meriden Board of Education did not violate Section 9.1 of the Collective Bargaining Agreement between the parties when it suspended the Grievant, Edward Boganski, for three days in December, 1999.

## REASON

Article IX, Section 9.1 of the Collective Bargaining Agreement clearly mandates that discipline be "progressive in nature" and consistent with the offense. It sets out the order of progressive discipline from oral warning through written reprimand to suspension without pay and termination. (Joint Exhibit II, Article IX, Section 9.1, Discipline and Discharge).

The Union strongly argued that due process was denied the Grievant when progressive discipline was ignored and oral warning and written reprimand were ignored. The Union was incensed that the Board jumped right to a suspension without pay. Yet, Section 9.1 does allow for initial discipline being suspension without pay or termination "depending on the severity of the offense". (Joint Exhibit II, Section 9.1). The issue then becomes, were the offenses of the Grievant so "severe" as to merit overlooking

0000172

oral and written warnings while meting out suspension. The answer in this case is yes. The offenses were that severe. Elkouri & Elkouri, in their book on arbitration, <u>How Arbitration Works</u>, 4th Edition, Pg. 671, acknowledges that there are "extremely serious offenses such as ...refusal to obey a legitimate order...which usually justify summary discharge without the necessity of prior warnings or attempts at corrective discipline." Section 9.1 incorporates and encodes that concept into its directives. Therefore, the inquiry is, were the actions of the Grievant so egregious as to merit jumping to the third level of discipline as the initial disciplinary action of the Board. The answer is yes.

Firstly, the Grievant refused to implement or ignored the oral directives of several Administration superiors including the Assistant Superintendent, Mr. Lamontagne, who said that he had spoken to Boganski for six to eight months regarding computer training for other custodians. (Union Brief, Page 3). Mr. Cordani, the Manager of Buildings and Grounds, testified that he directed Boganski to have the other custodians trained on the Controlled Air computer for months. (Union Brief, Page 5). Mr. Villar, the Assistant Principal of the school, testified that he too directed Boganski to get the training done. (Union Brief, Page 6). At the December 5th disciplinary hearing, Boganski was

26

again directed to arrange the training of the other custodians, but he had not done it before the next disciplinary hearing on December 23rd. There is no other interpretation of this inaction and overt ignoring of the wishes of his superiors over a protracted period of many months except the conclusion that the Grievant willfully and consciously set out to thwart or ignore the intentions of Villar and Cordani.

The orders of these administrators were legitimate directives based on the Administration's concern that having only one custodian knowledgeable about the HVAC controls was dangerous and risky. Mr. Boganski's excuses were many, (Board Brief, Page 16) but none of the excuses are proper defenses to disobeying direct orders from superiors. It has long been held that management has "the general right to manage the business." The Grievant, in a sense, by his unwillingness to have other custodians trained, was usurping the duties of the Administration, i.e. determining which employees would be trained on the HVAC control system. Such an attempt to thwart directives, especially directives having to do with a system that controls heat and air conditioning and, in a sense, the welfare and health of all the students, teachers and administrators of that school, is a serious offense. The Grievant's inactions in this matter alone is sufficient, in and of itself, to allow the

0000174

Board to skip the first two disciplining sanctions and mete out the more stringent discipline, suspension without pay.

As to the second charge that the Grievant was untruthful about his possession of the employee security codes for the Sonitrol system, there is no question that the charge, if true, is also so serious as to merit skipping over the lesser disciplinary steps. A false statement to a superior could be innocuous and of no major import. However, in this case, the alleged untruths directly affected security access to the school. (Board Brief, Pages 12-13). The safety of students, teachers and administrators is of paramount concern and a real duty imposed upon the Administration. The possible misuse of those codes by the Grievant himself or the possible misuse of those codes by others who might have had the ability to see them lying on the Grievant's desk highlights a possible real breach of security. Further, one can imagine the use by one employee of another's code, thereby blurring the lines of responsibility for the security system's maintenance, repair and function.

The Grievant's denial that he had the codes is not credible. They were sent to him marked "Personal and Confidential". They were seen on his desk on at least two occasions by Steven Papotto who even copies the list for Cordani. (Board Brief, pages 6-7). In fact, the list was eventually retrieved from Boganski's

28

office. Although Boganski claimed he gave the list to Ms. Pierce, the Principal, she denied that. Further, Boganski offered no credible evidence of how the list was in his office when Papotto found it. (Board Brief, Page 7).

Obviously, the mishandling of security access codes and being untruthful to one's superiors about those codes certainly gave the Board just cause to suspend the Grievant.

I have given short shift to the Grievant's complaint that the Administration, from Principal Pierce to Assistant Principal Villar, was harassing him. The Union makes an argument that the many memoranda written to the Grievant were evidence that Villar was pouring it on. I disagree. In the first place, Cordani and Pierce recommended Boganski for the Head Custodian position. If there was a conspiracy to "get rid of" the Grievant, the grievance procedure that resulted in a suspension was a lesser sanction than termination. It is not credible that there would have been a conspiracy among two Principals, a Manager of Buildings and Grounds, and an Assistant Superintendent just to get the Grievant suspended for three days.

Lastly, there is no proof of such a conspiracy. In fact, the evidence on hand clearly shows that Boganski was untruthful about the security codes and did not follow orders and set up the custodians' training on the Controlled Air system.

0000176

The Grievant was seriously insubordinate and untruthful with his superiors. I deny the grievance and uphold the three-day suspension of Mr. Boganski. The Board did not violate Article IX, Section 9.1 of the Collective Bargaining Agreement between the parties.

*M. Jackson Webber, Arbitrator*