

1

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
 2

 3   EDWARD BOGANSKI              CIVIL ACTION NO.

 4                                3:01CV2183 (AVC)

 5      VS.                       MARCH 17, 2005

 6
     CITY OF MERIDEN BOARD
 7     OF EDUCATION AND JOHN CORDANI

 8

 9         DEPOSITION OF: KATHLEEN MARY McPARLAND

10

11   APPEARANCES:

12

     For the Plaintiff:
13
       JOHN R. WILLIAMS & ASSOCIATES
14        51 Elm Street
          New Haven, Connecticut 06510
15        (203) 562-9931
       BY: KATRENA ENGSTROM, ESQUIRE
16

17   For the Defendant:

18     HOWD & LUDORF
          65 Wethersfield Avenue
19        Hartford, Connecticut 06114
          (860) 249-1361
20     BY: ALEXANDRIA L. VOCCIO, ESQUIRE

21
                    Wendy J. Leard
22              Registered Merit Reporter
                     CSR # 00039
23
       NIZIANKIEWICZ & MILLER REPORTING SERVICES
24              972 Tolland Street
         East Hartford, Connecticut 06108-1533
25                 (860) 291-9191
```

1   A   Right. In respect to his staff, they made a lot of accusations, but none of them panned out.

2   Q   Okay.

3   A   Let's see. The administration had the complaint that he was supposed to train people to open and close some kind automatic doors, which when I investigated it, I came to find out that he did train two people to do it. And those two people then decided to let it go and send two other people who didn't know how to do it.

The staff really wasn't cooperating. They really were not cooperating.

I had some talks with them about a lot of things that -- because when they made the accusation that he was stealing overtime, it was interesting to find that Mrs. Atkins, who made the complaint, was the one with the highest overtime than anybody else.

Q   Okay.

A   So I had some conversations with her about, you know, Where do you get that from? Where does it come from?

And the majority of the staff just didn't seem to want to change anything the way that Mr. Boganski wanted to change things to get the

1   work done, and they just didn't want to follow
2   directions.
3   Q   From Mr. Boganski?
4   A   Right.  And they were there prior to him.
5       And as for Mrs. Atkins, she had a very
6   close relationship with the principal and the
7   office staff.  And so she wasn't staying on her
8   assignment; she was spending a lot of time in the
9   office talking.
10      And Eddie was trying to get the
11  assignments evened out and they really weren't
12  cooperating.
13      So I found it to be more of a mutual
14  thing: nobody was cooperating with anybody.
15  Everything was, you know . . .
16  Q   Well, did that lack of cooperation result
17  in some of the work not getting done?
18  A   I believe so.  Yeah.
19  Q   And Mr. Boganski was the head custodian at
20  the time, right?
21  A   That's right.
22  Q   So ultimately he's responsible --
23  A   Right.
24  Q   -- for making sure the work gets done.
25  A   Right.

1   A   Yes.  Mm-hmm.

2   Q   Yes?

3   A   Yes.

4   Q   Okay.

5   A   And he also mentioned to me about a lot of work orders that were left to the plumber to do that were things that Eddie could have done and not given to the plumber.

9   Q   Anything else you remember about that conversation with Mr. Cordani?

11  A   Yeah, I had asked him also what did they want to do, because that is the main thing that I usually ask anybody, what is it they want them to do.

    And they -- and he also said they would like Mr. Boganski to leave Washington.

17  Q   That's what Mr. Cordani told you.

18  A   Mm-hmm.

19  Q   Yes?

20  A   Yes, Mr. Cordani said that.

21  Q   Did he tell you why he'd like Mr. Boganski to leave Washington?

23  A   He didn't say that he would like Mr. Cordani (sic) to leave Washington; he said the administration of Washington, the principals at

```
 1   Washington, would like Mr. Cordani -- Mr. Boganski
 2   to move on.
 3       Q    Okay.  And did you take from that
 4   conversation that he was -- that Mr. Cordani was
 5   saying, by "moving on," just go to another school,
 6   get out of my school?
 7       A    Right.  No, they would like him to step
 8   down as head custodian.
 9       Q    Okay.  Did Mr. Cordani actually tell you
10   that, that they wanted him to step down as head
11   custodian?
12       A    They would like him to move on.
13       Q    And that's all he said?
14       A    That's all he said.
15       Q    And you interpreted that as stepping down
16   as head custodian?
17       A    Yeah.  We're kind of acquainted with that.
18       Q    Okay.  Did you do any other investigation
19   regarding what happened with respect to this
20   purchase order incident?
21       A    I think I talked to Kathy Figueroa, who is
22   John Cordani's secretary.  And she also commented
23   that was ridiculous.  He needed to get oil.  She
24   couldn't understand why he couldn't get oil.
25       Q    Okay.  And you said that was ridiculous,
```

1   Q   Okay. And I'm sorry, you said you and
2 Mr. Dubin convinced Mr. Boganski?
3   A   Yes, Joe Dubin.
4   Q   Okay. Why did you attempt to convince
5 Mr. Boganski to take the position at Thomas
6 Hooker?
7   A   Because it was -- I had had a conversation
8 with Mr. Cordani and he said, "Fine, if he wants
9 to stay there, then eventually they'll fire him."
10  Q   And when did you have this conversation
11 with Mr. Cordani?
12  A   I don't recall. It was sometime after the
13 suspension and in between his transfer to Hooker.
14  Q   Was anyone else present when Mr. Cordani
15 said this?
16  A   No, it was on the telephone.
17  Q   Okay. And did Mr. Cordani explain why he
18 was making that statement?
19  A   Just that the administration wasn't
20 satisfied with Eddie's work.
21  Q   Okay. So Mr. Cordani specifically told
22 that to you, "the administration is not happy with
23 Eddie's work"?
24  A   Right.
25  Q   Did he -- did Mr. Cordani tell you any

1    other reason why -- strike that.
2         Who came up with the idea of Mr. Boganski
3    taking a position at Thomas Hooker? Was that a
4    member of the Board of Ed or was that your and
5    Mr. Dubin's position?
6    A    Well, there happened to be an opening
7    there on second shift.
8    Q    Okay.
9    A    And between the conversation with Joe
10   Dubin, Mr. Cordani, and occasionally Glen, we had
11   asked if the opening -- if there was an opening at
12   Thomas Hooker, could Eddie move to that position.
13   Q    Okay. So --
14   A    So Eddie applied and he signed a document
15   and he moved on.
16   Q    Okay. So you and Mr. Dubin are the ones
17   who raised the issue with the Board of Ed?
18   A    Yeah, after them making it very clear that
19   that's what they wanted, that they would like him
20   to move. And if he didn't move, they would
21   eventually fire him.
22   Q    Okay. And you're basing that on your
23   conversation with Mr. Cordani?
24   A    Mr. Cordani, yeah.
25   Q    Okay. And again, I just want to make sure

1  I'm clear.
2       After that conversation with Mr. Cordani
3  is when you and Mr. Dubin went and looked at
4  Mr. Boganski's personnel file?
5       A    Well, I didn't go.  Mr. Dubin and Tom
6  Bruenn went and looked at his personnel file.
7       Q    Okay.
8       A    And it was a very good personnel file.
9  There wasn't anything in there of any consequence,
10 you know, that would say that Eddie was a poor
11 employee.
12      Q    Okay.
13      A    So . . .
14      Q    And at that point, you guys recommended
15 that Mr. Boganski take this other position at
16 Thomas Hooker?
17      A    Yeah.  Mr. Boganski -- we recommended that
18 to Mr. Boganski because it was apparent by
19 the -- it was apparent to us by the constant memos
20 that they were not going to let up.  And every
21 day, no matter what he corrected, they found
22 something else wrong.
23           And by that time, Mr. Boganski was
24 becoming quite ill.
25      Q    Okay.  Let me ask you this:  Did you ever

71

1  he was given the memo to bring out the machine.
2  Q    This was marked Defendant's Exhibit 8 at
3  Mr. Boganski's deposition.
4       I just want to ask you, Is that the letter
5  of agreement that Mr. Boganski signed?
6  A    That's correct.
7  Q    Okay. And that pertained to his transfer
8  to Thomas Hooker?
9  A    Correct. And me and Joe Dubin drew that
10 up for him.
11 Q    And who signed that agreement on behalf of
12 the Union or the Federation?
13 A    I did.
14 Q    Okay.
15 A    Yeah.
16 Q    And ultimately Mr. Boganski grieved his
17 transfer to Thomas Hooker, correct?
18 A    That's correct.
19 Q    Okay. Why?
20 A    Because he felt that he lost pay and that
21 he was forced to move on.
22 Q    Okay.
23 A    And that his job was in jeopardy if he
24 didn't move on, and that by moving on, he lost
25 income.

1  Q   Okay. Did anyone from the Meriden Board
2  of Education force Mr. Boganski to sign this
3  document?
4  A   No.
5  Q   Okay. And accepting this position was
6  actually recommended by you?
7  A   Me and Mr. Dubin.
8  Q   Okay. Earlier, when you were discussing
9  that first conversation that you had with
10 Mr. Boganski, you said he brought up this incident
11 with the purchase order.
12 A   Mm-hmm.
13 Q   What was the context in which he brought
14 that subject up with you?
15 A   I believe that I called him up to ask him,
16 you know, "What seems to be the problem?"
17     "Well, one of the things was Mr. Cordani
18 made me -- wanted me to call in oil with a false
19 number, and I'm not doing it."
20 Q   Okay.
21 A   That's -- you know.
22 Q   That's all he said?
23 A   Mm-hmm.
24 Q   Yes?
25 A   Yes.

1   Q   Okay. Other than the conversations that
2 we've already discussed, do you recall having any
3 other conversations with Dr. Villar regarding
4 Edward Boganski?
5   A   No.
6   Q   Other than the conversations that we've
7 already discussed, do you recall having any other
8 conversations with Mr. Cordani regarding Ed
9 Boganski?
10   A   No.
11   Q   Okay. Other than the conversations that
12 we've already discussed, do you recall any other
13 conversations with Mr. Lamontagne regarding
14 Mr. Boganski?
15   A   I recall some conversations with
16 Lamontagne.
17   Q   Okay. Tell me about those conversations.
18   A   I don't know when they were. Most of them
19 were rather positive about Eddie's, you know --
20 that Eddie got the job because he was good at what
21 he did and that he had a future with the Board of
22 Ed and that just because this didn't work out
23 didn't mean that something else wouldn't work out
24 and that Eddie needed to take care of himself and
25 just move on from this situation.

```
 1              It was more of a caring conversation than
 2    anything else.
 3         Q    I'm sorry.  More of a what conversation?
 4         A    Caring conversation than anything else.
 5         Q    Okay.  Do you remember when that
 6    conversation was?
 7         A    I believe that it was right about the same
 8    time that Eddie signed that paper -- February, was
 9    it, 2000? -- to move on to Thomas Hooker.
10         Q    Okay.  And did you have one conversation
11    with Mr. Lamontagne or more than one conversation
12    regarding -- strike that.
13              You just mentioned a positive conversation
14    that you had with Mr. Lamontagne --
15         A    Mm-hmm.
16         Q    -- about Mr. Boganski's future.
17         A    Mm-hmm.
18         Q    Did you have only one conversation
19    regarding that topic or was there more than one
20    conversation?
21         A    I only remember one conversation about
22    that.
23         Q    Okay.  Do you recall any other
24    conversations with Mr. Lamontagne regarding
25    Mr. Boganski?
```

125

1  STATE OF CONNECTICUT

2  COUNTY OF TOLLAND

3       I, Wendy J. Leard, a Notary Public for the

4  State of Connecticut, do hereby certify that the

5  deposition of KATHLEEN MARY MCPARLAND, a witness,

6  was taken before me pursuant to the Federal Rules

7  of Civil Procedure, at the offices of HOWD &

8  LUDORF, 65 Wethersfield Avenue, Hartford,

9  Connecticut, commencing at 10:10 a.m., on

10 Thursday, March 17, 2005.

11      I further certify that the deponent was first

12 sworn by me to tell the truth, the whole truth,

13 and nothing but the truth, and was examined by

14 counsel, and her testimony stenographically

15 reported by me and subsequently transcribed as

16 herebefore appears.

17      I further certify that I am not related to

18 the parties hereto or their counsel, and that I am

19 not in any way interested in the event of said

20 cause.

21      Dated at Somers, Connecticut, this 25th day

22 of March, 2005.

23                                _____
                                  Wendy J. Leard
24                                Notary Public

25 My Commission Expires May 31, 2007