Westlaw.

Not Reported in A.2d                                                                                                           Page 1
1992 WL 172135 (Conn.Super.)
(Cite as: 1992 WL 172135 (Conn.Super.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
Hartford-New Britain, at
Hartford.
Barbara VINCE
v.
Audrey WORRELL, Commissioner, et al.
No. CV 86-0319386.

July 14, 1992.

MEMORANDUM OF DECISION

SCHALLER, Judge.

*1 The plaintiff brought this action originally in six counts claiming damages against the named defendants arising out of an alleged unlawful termination of her employment. The three counts remaining are the first count, asserting a violation of § 31-51g of the Conn.Gen.Stats., the second count, which repeats the allegations of the first count, but adds allegations regarding damages, and the fifth count, which is based on alleged violations of the plaintiff's free speech rights under the United States and Connecticut Constitutions.

FINDINGS OF FACT

The court finds the following material facts established by a fair preponderance of the evidence.

At all relevant times, Blue Hills Hospital was an alcohol and drug abuse treatment facility operated by the Connecticut Department of Mental Health. Audrey Worrell was, at all pertinent times, the Commissioner of the Connecticut Department of Mental Health. Stephen Glass was Superintendent of Blue Hills Hospital from 1982 to 1988. Henry Howard is currently and was at all relevant times Personnel Director at Blue Hills Hospital.

Keith Osborne was, from 1981 to 1985, Director of Admissions at Blue Hills Hospital, and Barbara Vince's immediate supervisor. Lamar Eberhardt has been the Affirmative Action Officer and Patients' Rights Advocate at Blue Hills Hospital since 1982.

Phyllis Kelleher is currently and was assistant director of nursing at Blue Hills Hospital. Joyce Gibson is currently and was, at all relevant times, the director of nursing at Blue Hills Hospital.

Plaintiff Barbara Vince began employment at Blue Hills Hospital as a part-time clerk/receptionist in the North Lobby in January of 1981. She was employed there from January 7, 1981 to September 28, 1984. Keith Osborne was Vince's supervisor; Osborne was responsible for scheduling hours and for sending Vince's hours to payroll. Vince's regular hours of work were Wednesday and Thursday, 4:00 to 9:00 P.M., and Saturday 1:00 to 9:00 P.M. Osborne also worked on Thursday evenings which were the only times that Vince worked with Osborne.

From the commencement of her employment at Blue Hills Hospital in January 1981 to the time of her discharge in October 1984 Vince received satisfactory employee evaluations and regular pay raises.

In September of 1982, a patient, Linda Davis, complained that Osborne sexually abused her in his office. Davis left Osborne's office very upset and saw Vince, whom she told that Osborne had sexually abused her. Davis claimed that she reported this incident to Vince rather than Osborne's superiors because she claimed that other women had reported similar incidents and were not believed. Davis gave Vince a written account of her experiences with Osborne. After Davis told Vince about the complaint, Vince asked Linda Davis to write a letter about Osborne. Vince did not initiate Davis' complaint concerning Osborne; Davis' oral and written statements were voluntary. Vince received a letter from Linda Davis (Exhibit E) which was written in September, 1982. Vince thought the first letter had been lost and so informed Davis, who wrote her statement again and gave it to Vince. The second letter (Exhibit F) was given to Vince by Linda Davis in September, 1982. Vince subsequently found the first letter. Vince then completed a "Personnel Incident Report" regarding the incident and submitted it to Howard, the Personnel Director at Blue Hills Hospital, who told her that "he would take care of it." Vince did not, however, give the letters to Howard because she did not trust Howard.

*2 Vince was required by Commissioner's Policy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
(Cite as: 1992 WL 172135 (Conn.Super.))

Page 2

Statement No. 29 to report any patient abuse. (Plaintiff's Exhibit S). Failure to report patient abuse was a ground for termination from Blue Hills Hospital. Commissioner's Policy Statement No. 29 also provided that "[a]ll reported incidents of patient abuse must receive a thorough investigation, regardless of the nature of the complaint." Howard was aware of his duty to investigate promptly any allegations of sexual abuse of patients. Commissioner's Policy Statement No. 29 did not specify that a complaint be in writing--(Plaintiff's Exhibit S). Howard's position regarding the complaint made by Vince was that, in order to undertake an investigation of the allegations against Osborne, he needed the complaint to be in writing.

Osborne was aware of the state's policy against sexual abuse of patients. Allegations of sexual misconduct with patients involve violations of a very serious nature.

In 1983 or 1984, Amini Scaria, head nurse in the detox unit, received a complaint from a patient "of a sexual nature" about Osborne. Scaria wrote a report and submitted it to Glass by sliding it under his door after hours. The next day Joyce Gibson, Director of Nursing, called Scaria into her office, told her that she had heard about some complaints that Scaria had received about Osborne, and told Scaria to "let Barbara [Vince] do her own thing and don't get involved." In early 1984, Vince received letters from three other patients, Marlene Thebeault, Stanley Michalkiewicz, and Shirley Randolph, containing allegations of sexual misconduct by Osborne (plaintiff's Exhibits G, H, and I).

Vince turned the patients' letters over to her attorney, Richard Tulisano. Vince told Howard in March 1984 that the letters were in the possession of her attorney. On July 10, 1984, during a meeting with Howard and Hawkins, Vince informed Howard of the written and oral statements alleging Osborne's harassment and abuse of female patients. Also during the July 10, 1984 meeting with Howard and Hawkins, Vince informed Howard that the letters from patients could be viewed at her attorney's office. Vince's attorney, Richard Tulisano, wrote to Osborne by letter dated July 23, 1984, informing him that the letters were in his possession, and stating, "If you have any question, please feel free to contact me...." Both Glass and Howard, as well as Osborne, knew about Attorney Tulisano's letter. None of the defendants ever attempted to contact Attorney Tulisano regarding the letters. In fact, Glass "most likely" told Osborne not to contact Attorney Tulisano.

Vince received a letter (Exhibit G) from Marlene Thebeault on March 16, 1985. She received a letter (Exhibit G) from Stanley Michalkiewicz at the same time. Vince received a letter (Exhibit I) from Shirley Randolph on Saturday, March 17, 1984. Vince did not give any of these letters to Henry Howard at the Hospital.

Patient abuse by employees came within Howard's responsibility. Vince first complained to Howard about alleged patient abuse by Osborne in March, 1984. By March, 1984, Howard had not received sufficient information from Vince which enabling him to investigate her allegations. At that time Vince refused to give Howard her lawyer's name, the names of any patients, or copies of any letters in March, 1984. Vince told Howard that she wanted him to help her get rid of Osborne. Howard's actions with respect to Exhibit K were motivated in part by his belief that Vince had solicited letters from an intoxicated patient who later retracted her statements about Osborne. Howard also understood that this same patient complained about Vince asking her to write things about Osborne which were not true.

*3 Linda Davis was last in Blue Hills Hospital in 1988. Osborne admitted her each time she was admitted. Davis claimed that Osborne asked her how she would feel about making love to an older man. According to her, he had a picture of his wife and two children on his desk. Davis claimed that the incident concerning Osborne took place during the day. Davis was 38 years old at the time of her testimony. Davis was refused admission to Blue Hills Hospital in 1984 or 1985 by Osborne and this made her angry.

As Director of Admissions, Osborne screened patients for admission to the hospital. He did not treat patients. Osborne's decision whether to admit a patient was reviewed by a medical doctor. Osborne's office was small, with two large windows facing a public driveway. The window drapes in his office were always open. The door to his office was almost always open. Two clerks sat at desks facing Osborne's office and could see into his office.

Osborne first had problems with Vince in July of 1982 when she reported an incident to others but not to Osborne, her supervisor. Osborne counselled Vince with respect to her job performance in December, 1982. Although counselled about reporting procedures, Vince complained to other staff about Ethel Sally and did not report to Osborne. Vince was counselled by Osborne about the Sally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 3

incident. During Osborne's counseling sessions Vince almost always had difficulty accepting responsibility for the behavior; she would get angry and blame others.

Vince told Osborne she had letters from patients after he had counselled her in March, 1984. Osborne reprimanded Vince in March, 1984 for posting a memo in which she assumed supervisory responsibilities over Osborne's staff. Osborne claimed that, in March, 1984, he received a call from a patient, Shirley R., in which she told him that Vince had coerced her into writing a letter stating that Osborne had approached her sexually, that she had written the letter, and that it was not true. Osborne notified the Affirmative Action Officer, Lamar Eberhart, that he had received the call by memo dated 3/22/84 (Exhibit 7). He asked Eberhart to investigate the incident.

On March 29, 1984, Osborne gave Vince an inter-departmental message consisting of a "position expectations memo"--(Plaintiff's Exhibit K). In the position expectations memo, Osborne warned Vince that continuing to engage in "activit [ies] which [are] detrimental to the best interest of the agency or of the state" would result in her dismissal (Plaintiff's Exhibit K). In the position expectations memo, one of the activities alleged to be detrimental to the best interest of the agency or of the state was that Vince had accused Osborne of sexual harassment of patients (Plaintiff's Exhibit K). Employees have a right and an obligation to report sexual abuse of patients by their supervisor. In the position expectations memo, one of the activities alleged to be detrimental to the best interests of the agency or of the state was that Vince had stated to staff that she had in her possession letters from patients alleging sexual misconduct by Osborne--(Plaintiff's Exhibit K). Vince had the right to talk to staff in the commonly accepted meaning of those terms, about patient abuse. Also, in the position expectations memo, one of the activities alleged to be detrimental to the best interests of the agency or or the state was that Vince posted a memo to staff regarding a procedure for reporting violations by nursing personnel (plaintiff's Exhibit K). The memo-posting incident to which the position expectations memo referred involved a memo posted by Vince regarding the reporting of violations of hospital procedure by nursing personnel. The hospital prohibits certain items from being passed through to patients. The hospital has a written policy that states what food is allowed to be passed through to patients--(Plaintiff's Exhibit C). One of Vince's duties was to inspect packages and make sure that no prohibited items were passed through.

*4 On March 16, 1984, Vince declined to allow a package through to a patient, because doing so would have violated the rule regarding what could and could not be passed through. Vince drafted a memo and posted it inside her station on March 16, 1984. Vince's March 16, 1984 memo listed the items that were allowed to be passed through to patients, and stated that anyone passing through prohibited items should be reported. Vince posted the memo on the inside of her station. Osborne removed the memo the next day. There was no written rule as to the posting of such memos. Vince could have been reprimanded for passing through items not allowed to be passed through to the patients.

In the position expectations memo, another of the activities alleged to be detrimental to the best interests of the agency or of the state was that Vince "allegedly" stated to staff that she was upset that Osborne had removed that memo--(Plaintiff's Exhibit K). The position expectations memo also outlined Osborne's expectations of Vince--(Plaintiff's Exhibit K). One of the expectations outlined in the position expectations memo was that Vince was to report to work as scheduled and complete duties and tasks as assigned by Osborne--(Plaintiff's Exhibit K).

One of the expectations outlined in the position expectations memo was that Vince was not to conduct any hospital business while not on duty nor engage in conversations with patients or other staff regarding her personal opinions about policies within the detox unit before, during, or after scheduled hours of work--(Plaintiff's Exhibit K). Howard would have limited this expectation to conversations with patients, because employees have the right to speak to each other and express their opinions to each other, and also have the right to do so after work. Blue Hills Hospital wanted Vince to stop communicating with staff persons.

Another expectation outlined in the position expectations memo was that Vince was not to post or otherwise distribute written materials to staff or patients without the approval and/or signature of Osborne--(Plaintiff's Exhibit K). Employees generally have the right to communicate with staff members without the written approval of their supervisor. One of the expectations outlined in the position expectations memo was that Vince was not to discuss the admission, discharge, or course of a patient's treatment without "appropriate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 4

authorization"--(Plaintiff's Exhibit K). One of the expectations outlined in the position expectations memo was that Vince should direct any complaints about or problems that she had with other staff members to Osborne-- (Plaintiff's Exhibit K). At the end of the position expectations memo, Osborne warned Vince that failure to meet the expectations outlined in the memo would result in disciplinary action up to and including dismissal--(Plaintiff Exhibit K). From the time of her complaints about Osborne in March 1984 to the time of her discharge, relations between the two deteriorated. In fact, following his issuance of the positions expectation memo and during the time period between March 1984 and October 1984, Osborne wanted Vince to be dismissed. Osborne was responsible for bringing to the attention of the administration all of the incidents that formed the bases for Vince's dismissal. Vince requested that she be transferred to a night other than Thursday, so that she and Osborne would not have to work at the same time, but Osborne refused.

**\*5** Vince was suspended for three days in July, 1984. She received a suspension letter (Exhibit O) dated September 10, 1984 and was suspended from her position at the hospital on September 28, 1984. Vince received a termination letter (Exhibit P) dated October 1, 1984. Vince was terminated from her position at the hospital on October 1, 1984.

On July 26, 1984, Vince was suspended without pay for three working days because of alleged "misconduct"--(Plaintiff's Exhibit L). The "misconduct" described by Glass included two episodes in which Vince had complained of discrepancies with her paycheck. Vince experienced several problems with her paychecks, resulting in the two episodes noted in the July suspension letter, where Vince became upset because her paychecks were not accurate. She did have a right to ask questions about her paychecks.

At the end of June, 1984, Vince was very upset and very angry over her paycheck, accusing Osborne of shorting her and not sending the proper information to the business office. At this time, Vince told Osborne in a very loud and angry manner that he was against her. Vince was again very angry and very loud over her paycheck while in the business office the next day. There was nothing wrong with Vince's paycheck at this time. She never lost money in a paycheck. Vince was upset over her paycheck approximately once a month prior to this incident. Osborne counselled Vince concerning these incidents on July 5, 1984.

Shortly after Vince's termination it was discovered that Neville Roberts, the payroll clerk at Blue Hills Hospital, had been embezzling from the hospital. Roberts was caught when he cashed an overtime check made payable to Vince. No employee, including Vince, ever lost money because of Roberts' actions. The July 26, 1984 suspension letter also referred to an incident where Vince had admonished an Agency Police Officer for not arresting an intoxicated visitor who had threatened her.

The police officer episode involved two intoxicated visitors who raised their voices in anger and swore at Vince. Vince raised her voice and summoned the agency police to the lobby.

Police officer Oliveiri told Osborne on July 5 about the incident involving Vince wherein Vince yelled at Oliveiri, told him he should have arrested a person, and was demeaning and called him names. Oliveiri recalled four incidents involving Vince and visitors wherein the visitors told Oliveiri that Vince was harassing them and calling them names. During one incident in June of 1984, Oliveiri observed the interaction between Vince and two visitors. Vince claimed to Oliveiri that the visitors threatened her and that they should be arrested. Several days later Vince called Oliveiri to the lobby and called him a coward for failing to arrest the visitors. Vince's behavior with the visitors was very hostile. Vince's behavior was very inappropriate, in that she "escalated situations" by name calling, raising her voice, leaning over the counter, pointing her finger and demanding they leave. Oliveiri reported the June incident to Osborne. Vince did not report Osborne to the Agency Police, to Oliveiri's knowledge, although she often reported other incidents. Vince called the visitors disparaging names. Oliveiri considered Vince's behavior to be inappropriate.

**\*6** Osborne was suspended from his job and subsequently terminated. He was reinstated after grieving his termination. Vince's job performance evaluation covered only the time period from September 1, 1982 to September 1, 1983. Anything which occurred before or after those dates would not be considered in that evaluation. Osborne did not have the authority to fire Vince. Osborne gave Vince the opportunity to discuss the contents of the position expectation memo and to ask questions. Vince did not ask any questions about the memo. Vince's suspension was disciplinary, while Osborne's suspension was pending an investigation. Osborne

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 5

discussed the position expectation memo with Vince. The position expectation memo was a collaborative effort between the personnel office and Osborne. The purpose of the position expectation memo was to get Vince to change her behavior, to stop stating to staff that she had letters from patients but refusing to show them, to stop talking to patients about Osborne and to stop directing Osborne's staff as to matters which were not her responsibility.

About July 5, a patient, Albina S., told Osborne that Vince approached her and said she knew Osborne and Albina were involved sexually, that Vince had letters from other patients, and that Vince was out to get Osborne fired. The patient was upset and Osborne told her to talk with the Affirmative Action Officer. Osborne reported this incident to Eberhart and Glass the next day. Osborne was not involved in the decision to suspend Vince in July.

Osborne received a letter from Attorney Tulisano at the end of July which he brought to Glass. Osborne did not know the identity of Vince's lawyer prior to this time. Osborne wrote a memo to Glass in early September wherein he described an incident involving Vince, Marsha Nash, and patient confidentiality. At this time, Vince told Osborne of a breach of patient confidentiality by Nash, but she refused to give Osborne the patient's name. In September Osborne was given information by his staff about Vince and a patient, Marsha C. Osborne was told that Marsha C. had been approached by Vince who asked her about having sexual relations with Osborne, that Marsha C. had become upset and left the hospital prematurely. Osborne gave this information to Glass and Eberhart.

Vince told Osborne she had letters about him from patients. Osborne told Vince to bring the letters to the hospital administration. Vince never told Osborne who the patients were. Osborne was 35 years old in 1982. Osborne has never kept pictures of his family on his desk. He did not see patients on Thursday evenings.

Osborne rated Vince less than good in her service rating (Exhibit A) with respect to judgment. It was Osborne's job as supervisor to report problems to the administration.

Vince was hired to work eighteen hours per week. Vince complained to Henry Howard about Osborne from mid-1982, stating that Osborne was not a good supervisor, that he favored other staff over her, but did not substantiate any of her claims. Howard wrote a memo to Vince as a result of his interactions with her and to indicate Vince should go to Osborne first with her concerns. In March 1984, Vince told Howard that he had to help her get rid of Osborne because he was having sexual relations with patients and that she had letters to prove it. This was the first time Vince had complained to Howard about Osborne sexually abusing patients. Howard asked Vince for the statements, or for copies of the statements from patients or the names of the patients and she refused to do any of those things. Howard asked Vince for copies of the letters three or four times.

*7 Blue Hills Hospital had an established procedure for reporting complaints such as those Vince was voicing. The policy on reporting was given to new employees upon hiring. Vince used the proper reporting form with regard to the Discola investigation.

The purpose of the position expectation memo (Exhibit K) was to get Vince to change her behavior and to stop inappropriate behavior such as that involving the patient Shirley R. Other things the memo was meant to accomplish, according to Howard, was to get Vince to give the information needed for investigation of her claims against Osborne and to stop her from discussing hospital issues with patients and posting directives for other staff. Howard discussed the contents of the July suspension letter with David Sullivan of the Department of Mental Health and with Glass. The Affirmative Action Officer, Lamar Eberhart, discussed the Shirley R. incident with Howard after Osborne reported it by memo (Exhibit 7). Howard attended a meeting with Vince, Eberhart and Julie Murtha to discuss the Shirley R. incident. At that meeting, Vince claimed that Blue Hills Hospital was out to get her (Exhibit 17). Howard first became aware of Attorney Tulisano's involvement with Vince by seeing a copy of Attorney Tulisano's letter (Exhibit M) at this time. At the end of September, Eberhart spoke to Howard concerning an incident with Vince and a patient, Marsha Connors. Eberhart told Howard that Vince, around September 21, had asked Connors about incidents involving Osborne and another patient, as well as Osborne and Connors, but that Vince couldn't talk about it then. Eberhart further said that Connors became upset with the incident and checked out of the hospital against medical advice. A meeting was held with Vince, Eberhart, Howard and a union representative to discuss the Marsha Connors incident on September 28, 1984.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Vince was placed on unpaid leave of absence pending an investigation of the matter. Howard and Eberhart spoke with Connors on October 1st and asked her to put her story in writing. Howard discussed this incident and the confidentiality incident with Dave Sullivan of DMH and the decision was made to terminate Vince.

Howard drafted the letter of suspension (Exhibit O) and the termination letter (Exhibit P) signed by Glass. Vince was terminated for repeated misconduct, including causing a patient to leave the hospital against medical advice, making accusations against staff without providing information so an investigation could be made, for the Shirley Randolph incident, for her behavior regarding her paychecks, for her behavior toward Oliveiri, for the failure to give information during the confidentiality episode and for upsetting other patients. Howard did not receive complaints about Osborne from anyone else. Howard considered Vince's behavior to be patient abuse. Vince's leave without pay was by statute while Osborne's leave with pay was because of a collective bargaining contract. Vince received the lowest "good" rating on her performance appraisal (Exhibit A) for knowledge or work, quantity of work, quality of work, initiative and cooperation, and a "less than good" rating for judgment.

*8 The July, 1984 suspension letter referred to an episode where Vince had allegedly inquired of a patient, Shirley Randolph, whether Osborne had made sexual advances toward her. In the Shirley Randolph episode, Randolph had arrived at the hospital intoxicated and begun making unsolicited statements to Vince regarding Osborne's sexual abuse of patients. Shirley Randolph wrote a statement regarding Osborne's activities, which statement she gave to Vince, but later recanted. Although no hospital official ever attempted to follow up on the allegations of patient abuse by contacting Attorney Tulisano regarding the letters, Lamar Eberhardt, the affirmative action officer, went to patient Shirley Randolph's house to follow up on a complaint regarding Vince. There was no written complaint in the Shirley Randolph situation, but an investigation was nevertheless conducted by Lamar Eberhardt. Eberhart told Glass about the Shirley Randolph incident in March of 1984. Glass told Eberhart to get information from Randolph.

Glass made the decision to write the position expectation memo to Vince. The intent of the suspension letter signed by Glass was to make Vince aware of inappropriate behavior that could be corrected prior to termination. Glass learned of the Marsha Connors incident through Eberhart. Glass considered the Marsha Connors incident extremely serious. Glass felt that Vince forced Connors out of treatment. After the Connors incident, Vince was placed on administrative leave pending an investigation. Glass did not see the patient letters Vince had until mid-1985 when he was shown them by DMH, central office personnel.

Glass had no reason to suspect Osborne of sexually harassing patients. According to Glass, Vince was terminated for failure to follow hospital policies, for failure to refrain from soliciting patients, for failure to refrain from harassing other staff. The Marsha Connors incident was the most important factor in her termination. Vince was not supposed to be involved in patient treatment in any way.

Lamar Eberhart was the affirmative action officer and patient rights advocate at Blue Hills Hospital during the time Vince was employed there. His duties included receiving and investigating patient complaints. In March of 1984 Eberhart was told of a situation involving Shirley R. and Vince by Osborne. Eberhart claimed he was told by Shirley R. that while she was in the hospital in an intoxicated state, Vince approached her and asked her to write and sign a letter that Osborne had molested her and other female patients, which she did; further that Vince asked her to sign a second statement a week later, which she did and that she wanted to retract those statements because Osborne had never done anything to her. Eberhart asked Shirley R. to put her story in writing. He did not instruct her what to write. Shirley Randolph wrote a letter which she gave to Eberhart (Exhibit 14). The letter from Shirley Randolph dated March 30, 1984 states that Vince told her what to write in the earlier letter (Exhibit I) about Osborne. Eberhart gave the letter to Howard. Osborne, on July 6, told Eberhart that a patient named Albina was approached by Vince concerning allegations against Osborne. Eberhart talked with Albina on July 6. Eberhart claimed that Albina stated she had not been molested by Osborne. Albina was nervous, upset and frightened. Eberhart brought the information about Albina to Howard. Vince never came to Eberhart with any complaints nor did she ever give him names of patients. Patients were informed by brochure, posters and in person that Eberhart was the person to whom complaints should be made.

*9 Eberhart met with Vince, Howard and Julie

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.