Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 7

Murtha on July 10, 1984. At that meeting, Vince said Osborne was having sex with patients but did not supply names or copies of the letters. Eberhart spoke with Marsha Connors on September 27, 1984. Eberhart claimed Connors said that Vince asked Marsha if she heard what was going on with Osborne and female patients and that some of it involved Marsha; further that Vince said she couldn't say any more and the next day (September 22, 1984), Marsha asked Vince what she meant and Vince said she couldn't talk. Eberhart concluded that, subsequently, Connors became upset and left the hospital. Eberhart, with Howard, spoke with Connors on October 1, 1984. They asked Connors to put her complaint in writing. They did not tell Connors what to say. Connors wrote the letter (Exhibit 15). The letter indicated that Connors had no idea what Vince was talking about, that she was trying to detox, was very confused, and got upset.

Juana DeCordova was a lead mental health worker at Blue Hills Hospital during the time Vince was employed. DeCordova's office was next to Osborne's office. Both offices are small.

Patients would talk to DeCordova about complaints they would have. No patient, including Linda D. even complained to DeCordova about Osborne. DeCordova's office door was open about two feet from Osborne's door and was kept open all the time. Ms. DeCordova often went into Osborne's office. DeCordova was familiar with Osborne's office. He never saw pictures on Osborne's desk. Osborne interacted well with his staff.

Joyce Gibson was Director of Nursing at Blue Hills Hospital during the time Vince was employed there. Gibson was in her office around 5 P.M. on a Thursday when Vince went to her to complain about her paycheck and wanted Gibson to get her money right away. Vince became hysterical and yelled at Gibson and accused her of keeping Vince's money. Gibson could not get Vince to listen to reason. Gibson witnessed Vince's behavior at other times as inappropriate, out of control and unreasonable. Gibson never received complaints about Osborne. Linda D. complained to Gibson about various things but not about Osborne.

Phyllis Kelleher was the assistant director of nursing at Blue Hills Hospital during the time Vince was employed. Kelleher and Vince worked some of the same hours. Vince complained to Kelleher about Osborne and her hours. On one occasion, Kelleher observed Vince becoming very upset, loud and tearful, and using obscenities in front of the admissions office. Kelleher had Vince evaluated by a doctor for her behavior. Vince never told Kelleher about Osborne molesting patients. Kelleher claimed that, in March, 1984, Shirley Randolph told her that Vince had asked her to write a letter about Osborne sexually harassing her, that it was not true and that Vince paid her to write the letter. Randolph was very tearful and remorseful at this time. Kelleher reported this incident to her supervisor the next day.

*10 Vince received a phone call from a person who complained about the breach of confidentiality by Marsha Nash. When Vince reported the breach, as she was required to do, she declined to disclose the patient's name. The hospital reprimanded Vince for refusing to disclose the name of the patient whose confidentiality had been breached. Vince was terminated, in part, for refusing to divulge the name of the patient whose confidentiality had been breached.

The termination letter stated "It is obvious, at this juncture, that you have failed to meet the expectations outlined by your supervisor in March, and it is for these reasons you are being dismissed."

Subsequent to Vince's termination from Blue Hills Hospital, an investigation was undertaken by the Department of Mental Health concerning allegations that Osborne had sexually molested a patient of the hospital. As a result of the investigation, Osborne was dismissed from Blue Hills Hospital. Osborne appealed his termination, and was reinstated when the patient who had complained failed to testify against him at his appeal. Osborne was not reinstated to his position as Director of Admissions, however.

Vince received a head injury when she was eight years old. She received a serious head injury in an automobile accident in 1959. Vince had an emotional breakdown and was hospitalized three weeks in 1978.

David LaCoss, the plaintiff's expert witness, is a psychiatric social worker. LaCoss' highest degree is a Master of Social Work degree which he received in 1983. LaCoss has counselled Vince approximately 100 times, beginning in 1973. LaCoss met with Vince regularly from 1973 to 1978, three times in 1979 and two times in 1982. LaCoss did not see Vince again until 1988. LaCoss treated Vince for dysthymia during the period 1973 to 1982. LaCoss treated Vince for histrionic personality disorder with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 8
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

paranoid dependent issues during this period. A person with such a condition is very concerned with how they come across to other people, and to be quite demonstrative, expressive, often exaggerate how they are feeling, according to LaCoss. Vince was diagnosed as suffering from dysthymia, atypical brain syndrome and histrionic personality disorder in 1982. Vince is still diagnosed by LaCoss as suffering from the same conditions.

Vince has become more paranoid now than prior to her employment at Blue Hills Hospital. She has difficulty in memory and concentration. Stress exacerbates her condition. Vince saw herself as a victim, whatever the reality was during her employment and termination. Vince would think any disciplinary action against her would be unjust. She would have a tendency to blame others for bad things in her life. Vince showed the same sort of symptoms in 1988 that she showed in 1982. Vince was hostile, paranoid, and mistrustful in 1982. She may be obsessed with what she perceived as her mistreatment at the Hospital. The organic component of Vince's condition will get worse over time. Vince's perception of events, even if wrong, would make her condition worse. Termination for other reasons could cause the same difficulties Vince presently has.

*11 Vince has two ongoing and untreated psychiatric disorders; first, dysthymia, and second, traumatic brain injury.

Dysthymia is an atypical depressive disorder, longitudinal in nature following the individual through life, often beginning in teenage years or manifesting itself first in teenage years and following on throughout adulthood. Dysthymia occurs in adolescents, or it is witnessed for the first time in adolescence. In dysthymia, persons feel dysphonic as opposed to euphonic, and they continuously feel out of sorts. Dysthymia is a disorder with some biological bases which can be treated. If it is not treated, it will run through the life of an individual. Vince has dysthymia that has continued for some years. Vince has a history of one major psychiatric unipolar depression in 1978 for which she was hospitalized for three weeks. Her dysthymia pre-dated her dismissal from Blue Hills Hospital, as did the episode of major depression which required hospitalization. Vince is currently moderately dysthymic, on a scale of 10, rating 3 or 4. Vince's current moderate dysthymia is not related to the events occurring at Blue Hills Hospital between 1981 and 1984.

Vince's pre-1984 psychiatric problems (dysthymia, and traumatic head injury) would have affected her behavior while employed at Blue Hills Hospital. Vince's pre-1984 psychiatric problems would affect her perception of events while employed at Blue Hills Hospital, as well as her reaction to these events. Her pre-1984 psychiatric problems, preceding her employment at Blue Hills Hospital, set her up to have difficulty in dealing with events which occurred at Blue Hills Hospital. Blue Hills Hospital is a stressful work location. Vince's pre-1984 psychiatric problems could cause her to misinterpret events occurring at Blue Hills Hospital. Vince's current condition and mental state were not caused by her dismissal from Blue Hills Hospital. Vince's condition and mental state could have been exacerbated by her dismissal from Blue Hills Hospital. Vince is currently not being treated for her dysthymia, a psychiatric condition that can be treated.

Vince was not in active psychiatric treatment for three to four years following her termination from Blue Hills Hospital. Vince's failure to seek psychiatric treatment for three to four years following her dismissal from Blue Hills Hospital is indicative that her dismissal from Blue Hills Hospital is not a major contributing factor to her current condition and mental state. Vince's organic brain disorder would not have abated had she not worked at Blue Hills Hospital because the disorder, by its nature, does not abate. Vince's dysthymia would have continued whether or not she worked at Blue Hills Hospital.

*Analysis of Issues*
General Statutes § 31-51q states that
  Any employer, including the state or any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs for any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1992 WL 172135 (Conn.Super.)  
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 9

*12 In order to prove a violation of this statute, the plaintiff must prove, by a preponderance of the evidence, that (1) she was exercising rights that are protected by the first amendment of the United States Constitution or applicable sections of the Connecticut Constitution; (2) that she was fired "on account of" the exercise of such rights; and (3) that the exercise of her first amendment rights did not substantially or materially interfere with her bona fide performance or with the working relationship between the employee and the employer. [FN1]

Because there are no Connecticut cases interpreting this statute the court relies on federal and state decisions applying federal law to guide the analysis of this cause of action. For that reason, the above-noted elements of this General Statutes § 31-51q action must be reconfigured to comport with the federal law analysis used to determine whether a public employee is discharged or disciplined in violation of first amendment rights. The parties appear to agree that the court should adopt the test used in similar actions brought under 42 U.S.C. § 1983. See _Mt. Healthy City Board of Education v. Doyle_, 429 U.S. 274, 284-85, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

Under the _Mt. Healthy_ test, the plaintiff must first prove that her conduct was constitutionally protected. Id., 287. This element requires a two-step inquiry in which the plaintiff must first show that her speech was "on a matter of public concern," and, then, that the employee's free speech rights outweigh the government's interest as an employer. Second, the plaintiff must prove that protected speech or conduct was a substantial or motivating factor in the defendant's adverse employment decision. Id. Third, if the plaintiff meets her burden of proving the first two elements, the defendant must then show, by a preponderance of the evidence, that it would have reached the same decision as to the plaintiff's employment even in the absence of the protected conduct. Id. If the plaintiff meets this test, there is an additional burden not present in the _Mt. Healthy_ analysis, but imposed by General Statutes § 31-51q. In connection with this element, it must be shown that the exercise of protected rights did not substantially or materially interfere with: (a) the employee's bona fide performance; or (b) the working relationship between the employee and the employer. The _Mt. Healthy_ test, along with the additional Connecticut statutory element, may be used to establish liability under General Statutes § 31-51q.

A. _First Amendment Protection_

The federal constitution merely establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." _Cologne v. West Farms Associates_, 192 Conn. 48, 57. 469 A.2d 1201 (1984). Neither of the Connecticut appellate courts has determined the extent of the state constitutional protections involved herein, nor have the parties addressed and developed those protections. Under those circumstances, the court will consider the protections provided by the state and federal constitutions as coextensive.

*13 First amendment jurisprudence clearly establishes that a state may not discharge an employee on a basis that infringes upon the employee's constitutionally protected interest in free speech, even if the employee is a probationary or an at-will employee. _Rankin v. McPherson_, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1986), citing _Perry v. Sindermann_, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); _Mt. Healthy v. City Board of Education v. Doyle_, supra, 284-85. However, because of the state's compelling interest as employer, the nature of the protection offered by the first amendment differs when the statement is made in the context of a public employment relationship. See _Connick v. Meyers_, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Thus, the government's power _as an employer_ to make hiring and firing decisions on the basis of what its employees say is much greater than its power to regulate expression by the general public. See _Pickering v. Board of Education_, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Because of the "enormous variety of factual situations in which critical statements by ... public employees that may be thought by their superiors to furnish grounds for dismissal," the Supreme Court has declined to "lay down a general standard against which all such statements may be judged." _Vasbinder v. Ambach_, 926 F.2d 1333, 1339 (2d Cir.1991), quoting _Pickering v. Board of Education_, supra, 569. Instead, the Court has stated that the determination of whether a public employer has improperly discharged or disciplined an employee for engaging in protected speech requires "a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interests of the state, as an employer, in promoting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 10
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

the efficiency of the public services it performs through its employees." *Rankin v. McPherson,* supra, 284; quoting *Pickering v. Board of Education,* supra, 568; *Connick v. Meyers,* supra, 140.

a) *"Public Conern"*

The threshold question in applying the *Pickering* balancing test is whether the plaintiff's speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Meyers,* supra, 146. Whether an employee's speech touches on a matter of public concern must be determined by the content, form, and context of a given statement. Id., 147-48; *Brasslet v. Cota,* 761 F.2d 827, 840 (2d Cir.1985).

Two United States Supreme Court cases illustrate what is meant by "a matter of public concern." In *Connick v. Meyers,* supra, an assistant district attorney was fired after she prepared a questionnaire soliciting the views of her fellow staff members concerning office and personnel policies in the district attorney's office and implicitly criticizing the district attorney. Id., 141. The court found that the questionnaire, with one exception, did not fall under the rubric of matters of public concern. The court stated that the questions were not of public import primarily because they did not seek to inform the public that the district attorney's office was not discharging its governmental responsibilities, nor attempt to bring to light actual or potential wrongdoing or breach of public trust on the part of the district attorney. Instead, the court noted, the focus of the communications was "to gather ammunition for another round of controversy with [the plaintiff's] superiors." Id. The court stated that
>  *14 [t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark--and certainly every criticism of a public official--would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the first amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. supra, 149.

*Connick v. Meyers,* supra, 149.

Contrast *Rankin v. McPherson,* supra, in which the plaintiff, a deputy constable with "purely clerical" responsibilities, remarked after an attempted assassination of then President Reagan "If they go for him again, I hope they get him." Id., 380. The court, considering the statement in context, found that it addressed matters of public concern, noting that the statement was made during a discussion of administration policies, and that it was the kind of statement traditionally afforded first amendment protection. Id., 386.

It is apparent that the "matter of public concern" determination ultimately turns upon whether the speaker is exercising his or her rights as a *citizen,* or as an employee, expressing grievances with the circumstances of his or her employment. See *Terrell v. University of Texas System Police,* 792 F.2d 1360, 1362 (5th Cir.1986), cert. denied 479 U.S. 1064 (1987). Illustrative of this distinction is *Callaway v. Hafeman,* 832 F.2d 414 (7th Cir.1987), a case in which an employee of a public school district alleged that she was fired because she complained to school district administrators that she was being sexually harassed by her supervisor. Id. The court held that "incidences of sexual harassment in a public school district are inherently matters of public concern," but ruled that
> [w]hile the content of [the plaintiff's] communications touched upon a matter of public concern generally, she was not attempting to speak out as a citizen concerned with problems facing the school district; instead, she spoke as an employee attempting to resolve her private dilemma.

Id., 417.

In order to determine whether the plaintiff's statements addressed a matter of public concern, the court must first identify the speech acts which, according to the plaintiff, led to her dismissal. Then, the court must determine whether each speech act or group of speech acts constituted "expression on a matter of public concern." Based on the findings of fact, the court concludes that the plaintiff's allegations of sexual impropriety constitute speech on a matter of public concern; the remaining speech by the plaintiff is "private" speech not addressed to the public by the plaintiff in her role as citizen.

b) *The Balancing Test*

Based on the determination that portions of the plaintiff's speech addressed a matter of public concern, the second step of the first amendment inquiry requires that the speaker's interest in making the statement be balanced against "the interest of the state, *as an employer,* in promoting the efficiency of the public services it performs through its employees." (Emphasis added) *Rankin v. McPherson,* supra, 388; *Pickering v. Board of*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
1992 WL 172135 (Conn.Super.)  
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 11

*Education,* supra, 568. In performing the balancing, the manner, place, and time of the employee's expression are relevant, as is the context in which the dispute arose. *Rankin v. McPherson,* supra.

**\*15** "[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise. Interference with work, personnel relationships, or the employee's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." Id., 388. Thus, in performing the second part of the *Pickering* balancing test, the Supreme Court has recognized as "pertinent considerations" whether the statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speakers duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson,* supra, 388, citing *Pickering v. Board of Education,* supra, 570-73.

The court must then weigh the importance of the speech, taking into consideration the time, place, manner of the speech; statements "on matters of public concern" made by the plaintiff as citizen, are entitled to much greater weight than those statements not on matters of public concern or those made by the plaintiff as employee. For example, an employee's charge of unlawful conduct may be given far greater weight in the balancing process than a complaint about internal office operations and relations. *Vasbinder v. Ambach,* supra, 1339. Compare *Giaclone v. Abrams,* 850 F.2d 79, 85-86 (2d Cir.1988) (complaint about tax law interpretation carries little weight in the balancing process) with *Rookard v. Health & Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983) (complaint of fraudulent and corrupt practices carries great weight).

Proceeding with the analysis, the court must next determine what speech is protected, and what is not protected. Based on the facts found, the court has concluded that, among the plaintiff's activities contained in the findings of fact, the plaintiff's allegations of sexual impropriety constitute speech enjoying first amendment protection; the remaining speech is "private" speech, not addressed to the public by the plaintiff in her role as citizen and, therefore, outside the scope of first amendment protection provided to government employees.

B. *The "Substantial Factor" Test*

Based on the determination that a portion of the plaintiff's speech comes within the protection of the first amendment, the court must next decide whether the plaintiff was discharged "on account of" her exercise of these protected rights.

Connecticut courts look to federal law for guidance in analyzing the propriety of an allegedly tortious employment decision. See *Ford v. Blue Cross & Blue Shield of Connecticut,* 216 Conn. 40, 53, 578 A.2d 1054 (1990) (applying burden-shifting analysis of *McDonnell Douglas Corporation v. Green,* [FN2] 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) in a state-law workers' compensation discrimination case); *Chestnut Realty v. CHRO,* 201 Conn. 350, 358-362, 514 A.2d 749 (1986) (applying *McDonnell Douglas* test to housing discrimination claim brought under General Statutes § 46a-64); *Wroblewski v. Lexington Gardens, Inc.,* 188 Conn. 44, 53, 448 A.2d 801 (1982) (applying burden-shifting analysis to sex discrimination action); *Pik-Kwik Stores, Inc. v. Commission on Human Rights & Opportunities,* 170 Conn. 327, 331, 365 A.2d 1210 (1976) (sex discrimination case applying burden-shifting standards). Where the plaintiff is a public employee who alleges that an adverse employment decision impermissibly interfered with the employee's first amendment rights, the federal courts apply the standard enunciated in *Mt. Healthy,* supra. Here, because an action under General Statutes § 31-51q is similar to an alleged first amendment violation under 42 U.S.C. 1983, the most appropriate approach is that contained in the *Mt. Healthy* case.

**\*16** Under the *Mt. Healthy* causation analysis a plaintiff, upon showing that her conduct was constitutionally protected, must first show that the protected conduct was a "substantial factor" or a "motivating factor" [FN3] in the defendant's employment decision. *Mt. Healthy Board of Education v. Doyle,* supra, 287. Thus, here the court must determine whether the plaintiff's *constitutionally protected* speech was a substantial or motivating factor in the adverse employment decision. In this instance, the court will assume, without deciding, that the plaintiff has met her burden on this issue in view of the court's conclusion that the plaintiff's case fails on other grounds.

C. *The Defendant's "Legitimate" Grounds for Dismissal*

Assuming for purposes of this analysis that constitutionally protected conduct was a substantial or motivating factor in the public employer's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1992 WL 172135 (Conn.Super.)
**(Cite as: 1992 WL 172135 (Conn.Super.))**

Page 12

employment decision, then, under the second part of the *Mt. Healthy* causation analysis, the *defendant* must show, by a preponderance of the evidence, that it would have reached the same decision as to the plaintiff's employment even in the absence of the protected conduct. *Mt. Healthy Board of Education v. Doyle,* supra, 287. The court then undertakes to examine all of the proffered reasons for the adverse employment decision, *except* those that come within the protections of the first amendment. If the defendant can show that the plaintiff would have been fired even if she had not exercised rights protected by the first amendment, then the defendant has met its burden under the *Mt. Healthy* test. The plaintiff would, therefore, have failed to prove that her termination was "on account of" protected speech under General Statutes § 31-51q. On the basis of the findings of fact, the court concludes that, indeed, the plaintiff would have been fired notwithstanding her exercise of protected first amendment rights. Specifically, the plaintiff would have been fired in any event for the reasons recited in the termination letter, including: causing a patient to leave the hospital against medical advice, making accusations against staff without providing information so an investigation could be made, for the Shirley Randolph incident, for her behavior regarding her paychecks, for her behavior toward Oliveiri, for the failure to give information during the confidentiality episode and for upsetting other patients.

D. *Interference With Employer-Employee Relations*

Unlike other employment discrimination statutes, e.g., General Statutes § 31-290a; 42 U.S.C. § 2000e, et seq., General Statutes § 31-51q imposes an additional burden of showing that the employee's *protected* activity did not "substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer." General Statutes § 31-51q. Having decided that the plaintiff has not shown by a preponderance of the evidence that she was fired "on account of" her constitutionally protected activity, but on account of other, legitimate reasons, the court need not analyze the issue of whether the plaintiff's protected activity impaired her job performance or her working relations.

*17 For the foregoing reasons, judgment may enter on all counts in favor of the defendants.

> FN1. In this decision the court need not decide whether the plaintiff or the defendant bears the burden of proof on this issue.

> FN2. In *McDonnell Douglas,* the Supreme Court stated that in an action for unlawful employment discrimination under 42 U.S.C. §§ 2000e et seq., the plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of illegal discrimination. If the plaintiff meets this initial burden, the burden shifts to the defendant, who must rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for its employment decision. If the defendant carries this burden, then the presumption of discrimination is removed, and the plaintiff then bears the burden of proving to the finder of fact that the employer was motivated by discriminatory reasons, or that the employer's proffered reason is merely pretextual.

> FN3. It appears that the two terms may be used interchangeably. See *Mt. Healthy,* supra, 287.

1992 WL 172135 (Conn.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.