UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWARD BOGANSKI | : | |
| VS. | : | NO. 3:01CV2183(AVC) |
| CITY OF MERIDEN BOARD OF EDUCATION, ET AL. | : | JUNE 8, 2005 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. BACKGROUND

The plaintiff is a resident of Meriden, a single father who has raised his three children for the past fifteen (15) years. He has worked for the Meriden Public Schools since 1993 as a custodian and van driver. In the fall of 1997, he was promoted to a head custodian position at Washington Middle School and worked the day shift, which permitted him to arrive home shortly after his children came home from school. In 1999, his children were 7, 9 and 11. He has been regarded as a highly motivated, energetic employee, and he has consistently received excellent evaluations, with the exception of the winter of 1999-2000. (Ex. 4, Ex. 12)

He was suspended in December, 1999, shortly after he reported that John Cordani, Director of Buildings and Grounds for the School District, had ordered

him to make up a purchase order number to facilitate a delivery of heating oil to Washington Middle School.  Purchase orders were Cordani's responsibility, and he was enraged at the audacity of a custodian reporting him to the Assistant Principal of the school (Jeffrey Villar), and subsequently to the Assistant Superintendant, Glen Lamontagne.  (Ex. 1, pps. 57-8) (Ex. 11)

Shortly after this incident, Cordani encouraged Villar to take retribution against the plaintiff.  (Ex. 1, pps. 65-66) Villar was a new employee with little experience.  Cordani sent a memorandum on November 8 to Villar, claiming that the plaintiff improperly had custody of a list ("the Sonitrol list") which contained the confidential security codes of employees to the school buildings. Ex. 3 The next day, Villar went to Boganski and asked whether he had such a list. Boganski asked him to search his office, and Villar did look throughout his office, finding nothing. (Ex. 5)  Later, the school's plumber, Steve Papatto told Villar that he saw the Sonitrol list on the plaintiff's desk. [1]  (Ex. 1, pps. 234-5) This incident was used as a basis to suspend Boganski for three (3) days on December 23, 1999.  (Def. Ex. H) Prior to the incident, Boganski had a good working relationship with the Assistant Principal Villar. (Ex. 6)

---

[1] It was unclear what employees were authorized to have a copy of the Sonitrol list, Kathy McParland, the union President in 12/99, knew of numerous head custodians at other Meriden schools who had a copy of the list. Ex. 15 , McParland Affidavit

Within a few weeks after Boganski raised the purchase order issue, he began receiving numerous negative memoranda from the new Assistant Principal. (Ex.1, pps. 65-66, 68-70, Ex. 9) Villar wrote memos to the plaintiff to make repairs when he knew that Boganski was out on vacation in December. (Ex. 1, pps. 69-70, Ex. 10) Boganski attempted to respond to the criticisms leveled against his performance. (Ex. 19)

After Boganski filed a grievance on January 5, 2000. John Cordani told his union representative, Kathleen McParland, that if Boganski did not accept a transfer and demotion, that "eventually they'll fire him". (Ex. 13, Ex. 2, p. 67, 68) This was relayed to the plaintiff, who feared for his job and his ability to support his children. ( Ex. 2, p. 69) The intensity of negative memoranda from Assistant Principal Villar increased. Boganski accepted a transfer to Hooker Elementary School, became a custodian again, and was assigned to the 3-11 PM shift for the next two years. (Ex. 14) The altered schedule prevented him from properly caring for his children during a critical period in their formative years and he was demoted from Head Custodian to a custodian position, reducing his salary. (Ex. 16)

Since the plaintiff is a conscientious worker, his evaluations were excellent as of September, 2000 and he was finally promoted to head custodian

at Benjamin Franklin Elementary School at the end of 2002. (Ex. 4)

## II.    STANDARD FOR SUMMARY JUDGMENT

When passing upon a motion for summary judgment, the district may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). In a case where an employer's state of mind is at issue, careful scrutiny of factual allegations is required, since there may be circumstantial evidence t support the required inference of discrimination. Konits v. Valley Stream Central High School District, 394 F. 3d 121 124 (2d Cir. 2005),  citing Graham v. Long Island R. R., 230 F. 3d 34, 38 (2d Cir. 2000) The court must resolve any ambiguities and draw all inferences against the moving party. Tenenbum v. Williams, 193 F. 3d 581, 593 (2d Cir. 1999), cert. denied, 529 U. S. 1098 (2000). The evidence of the party against whom summary judgment is sought must be accepted as true.  Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary

judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

"A party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law....The moving party is said to bear both the initial burden of production and the ultimate burden of persuasion on the motion....A nonmoving party, even though having the ultimate burden at trial, may indeed have no obligation to offer evidence supporting its own case unless the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132-33 (1st Cir. 2000).

## III. ARGUMENT

### A. Protected Speech

In a First Amendment retaliation case, the plaintiff must show that (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. Cobb v. Pozzi, 363 F. 3d

89, 102 (2d Cir. 2003). Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996); Manoharan, M.D. v. Columbia Univ. College of Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir.1988).

In the Second Circuit, courts look to the "primary aim" or "motive" of the individual in determining whether the speech was made as a citizen on matters of public concern or whether it was motivated primarily by private interest. Ezekwo v. NYC Health and Hospitals Corporation, 940 F. 2d 775, 780-81 (2d Cir., 1991). Matters which are extensions of employment disputes involving purely personal concerns are not protected by the First Amendment. In Ezekwo, a physician filed an action against her employer after being denied a residency appointment at a hospital. Her complaints were personal in nature and generally related to her situation within the hospital residency program, thus were not considered protected by the First Amendment.

In Morgan v. City of Milford, a former city employee appealed the City's decision not to hire him based on his prior felony conviction; his speech during the appeal process was not deemed to be a matter of public interest or concern. 914 F. Supp. 21 (1996).

Recently, in 2005, the Second Circuit concluded that a teacher who raised concerns about the treatment of a custodian at the school who happened

to be female, and who filed a lawsuit in 1999 alleging retaliation for her speech, should be protected under the First Amendment. Konits v. Valley Stream Central High School District, 394 F. 3d 121,126 (2d Cir. 2005) She alleged that school district personnel had engaged in retaliation. The teacher settled her first case in 1999, but the retaliation continued, and she filed a second lawsuit after she was denied various employment opportunities within the school district. The Second Circuit concluded that Konit's claim that she was retaliated against because she had filed a lawsuit alleging retaliation for assisting a female custodian with an gender employment discrimination claim fell within the ambit of First Amendment protection; the subject of the lawsuit was a matter of public concern (gender discrimination). Id. At 126.

In Mazurek v. Wolcott Board of Education, a substitute teacher raised the issue of the school district's hiring practices. 849 F. Supp. 154 (D. Conn. 1994) The court found that her complaints raised a matter of public concern, because they applied not only to her but to all potential applicants, and therefore her speech was constitutionally protected.

If the speech is protected, the Court is required to perform a balancing test to see if the interests of the employee, as a citizen, in commenting upon the subject at issue outweigh the interests of government, as the employer, in

promoting an efficient work environment. Pickering v. Board of Education, 391 U. S. 563, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968).

The plaintiff here was bringing a matter to the attention of his employer which he believed raised a questionable business practice that could affect employees and management. He called his supervisor, Jeffrey Villar, the Assistant Principal, and after contacting Cordani again, and receiving the same directive, called the Assistant Superintendent. (Ex. 1, pps. 49-54)   The issue was not a matter of personal concern; he was raising a question concerning proper business procedures in the school district. As such, it should be considered protected activity within the First Amendment.

    B.    Adverse Employment Action

Ed Boganski was forced to agree to a transfer and demotion to another school in order to save his job. Although Cordani did not have the direct authority to terminate him, he was able to work with the Principal or Assistant Principal to accomplish his goal.

At Hooker School, as of February, 2000, the plaintiff worked as a custodian, not a head custodian, he had reduced access to overtime, and he was placed on second shift, 3-10 P. M., which reduced his ability to supervise his children after school. He lost substantial income for the next two years, until

he was promoted to head custodian at another school, due to reduced overtime opportunities and a lower hourly wage rate. (Ex. 16) He suffered an adverse employment action which was involuntary, taken after the union president conveyed Cordani's message. (Ex. 14)

C. Causal connection between protected activity and adverse employment action.

In general, a connection between an employee's complaint and retaliatory action by the employer can be inferred if the adverse action takes place shortly after the complaint is made. Stephens v. State University of New York at Buffalo, 11 F.Supp.2d 242, 250 (W.D.N.Y.1998) (seven month gap between protected activity and adverse job action)

In Quinn v. Green Tree Credit Corp., the court concluded that a causal connection was demonstrated because the plaintiff was discharged less than two months after she filed a complaint with management and ten days after she filed a complaint with the state agency which investigated such complaints. 159 F.3d 759, 769 (2d Cir.1998).

Within three (3) weeks after Boganski raised questions about John Cordani's directive to make up a purchase order number in order to obtain a fuel oil delivery for Boganski's school, he was subjected to micro-management by

his direct superiors. Cordani sent a memorandum on November 8, 1999, accusing Boganski of possessing a list of employee security codes. (Ex. 3) When Assistant Principal Villar brought this to his attention, Boganski asked Villar to search his office and desk; nothing was found. (Ex. 5) Shortly thereafter a copy of the Sonitrol list was found on his desk by the school plumber, he was called to a meeting with Villar and the Principal, Shelley Pierce, and given a three (3) day suspension. (Def. Ex. H)

When the plaintiff raised questions about the sequence of events in November and early December, and filed a grievance concerning the suspension, the intensity of negative memoranda from Villar increased, and he was advised by his union president that the goal was to terminate him. [2] (Ex. 2, pps. 67, 68) In February, 2000, he agreed to a transfer to Hooker School, and took a demotion and shift change, due to the intimidation.

The plaintiff had worked for six years without incident in the school system with excellent evaluations. The timing of the disciplinary action shortly after his complaint about Cordani's business practices creates a material issue of fact.

---

2 After his transfer to Hooker School, Cordani attempted to influence the Head Custodian, Richard Carroll, to harass the plaintiff. The Principal wrote a memorandum to Cordani advising him not to interfere. (Ex. 14)

    D. Validity of Complaint

When an employee makes a complaint against an employer in good faith, the employer may not retaliate. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir.1996)

In employment discrimination cases, courts have held that the plaintiff is not required to prove the merits of his underlying complaint, but he must demonstrate that he was acting under a good faith, with a reasonable belief that improper or illegal action has occurred. His belief may even be mistaken, but employer retaliation is prohibited if the allegations of discrimination have an objectively reasonable basis in fact. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001)

Plaintiff argues that the same reasoning should be applied to a retaliation claim for First Amendment activity; that a good faith report of unethical conduct should also be protected.

**IV. CONCLUSION**

WHEREFORE, for the reasons set forth above, plaintiff respectfully requests that the defendants' Motion for Summary Judgment be denied.

                    THE PLAINTIFF

BY:________________________

KATRENA ENGSTROM (ct09444)
51 Elm Street
New Haven, CT 06510
203/562-9931
FAX: 203/776-9494
E-Mail: kengstrom@johnrwilliams.com
His Attorney

CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on the date set forth above, to the following counsel of record:

Attorney Alexandria L. Voccio
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114-1190

Attorney Deborah L. Moore
Corporation Counsel's Office
142 East Main Street, Room 240
Meriden, CT 06450

Gary Phelan, Esq.
Klebanoff & Phelan, P.C.
433 South Main Street, Suite 117
West Hartford, CT 06110

______________________________

Katrena Engstrom

13